826 So.2d 916 (2002)
Samuel L. SMITHERS, Appellant,
v.
STATE of Florida, Appellee.
No. SC96690.
Supreme Court of Florida.
May 16, 2002.
Rehearing Denied September 13, 2002.
*918 James Marion Moorman, Public Defender, and Douglas S. Connor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of two convictions of first-degree murder and the sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the convictions and sentences.
The record reveals the following facts. In 1995, Sam Smithers agreed to mow the grass at a vacant Plant City house owned by Marion Whitehurst. Whitehurst and Smithers attended the same church. Whitehurst was attempting to sell the house and therefore needed the landscape to be maintained by Smithers. There are three ponds surrounding the house and the twenty-seven acre property is enclosed by a fence with a gate at the front. Whitehurst gave Smithers a key to the gate but not the house.
*919 In 1996, Smithers and Whitehurst renewed their agreement. Smithers mowed the lawn the week of May 20 and Whitehurst paid Smithers on May 26. At approximately 7 p.m. on May 28, Whitehurst decided to stop by the property. The gate was locked when she arrived, but after opening the gate and driving to the house, Whitehurst found Smithers' truck parked just outside the carport. Smithers was sitting in the carport cleaning an axe. Smithers told Whitehurst that he had returned to the property to cut down some tree limbs. During the conversation, Whitehurst noticed a pool of blood in the carport. Smithers told her that someone must have come by and killed a small animal. He assured her that he would clean up the mess.
Although Whitehurst left the house, she was bothered by the pool of blood, and therefore she contacted the Sheriff's Department. Later that night, Deputy Skolnik met Whitehurst at the property. The pool of blood had been cleaned up, but the deputy noticed what appeared to be drag marks in the grass leading towards one of the ponds. The deputy followed the drag marks down to the pond and discovered a dead female body floating in the water. The woman was later identified as Cristy Cowan. A dive team subsequently discovered a second dead female body in another part of the pond. She was later identified as Denise Roach.
A search of the Whitehurst house revealed a condom wrapper in one of the bedrooms and a semen stain on the carpet. Test results established that Cowan could not have contributed to this stain, but Roach and Smithers could not be excluded. A fingerprint taken from the kitchen was identified as having been made by Smithers. Roach's DNA was consistent with a blood stain found in the carport. Shoe prints by the pond matched the shoes found in Smithers' home. Also, Smithers and Cowan were seen on a convenience store videotape about an hour before Whitehurst arrived at the property on May 26. The videotape depicted Smithers and Cowan entering and leaving the store together.
On the night of May 26, two detectives went to Smithers' home and Smithers agreed to accompany them to the Sheriff's Office for an interview. Smithers requested that his wife join them. Smithers was questioned for almost three hours. Detective Flair read Smithers his Miranda[1] rights and Smithers waived his rights. At the end of the interview, Smithers agreed to return the next morning and take a polygraph test.
Upon returning the following morning, Smithers was given a written version of his Miranda rights. Smithers signed a waiver of rights form and proceeded to take the polygraph test. Afterwards, Detective Metzgar explained to Smithers that the polygraph test indicated that he was not telling the truth and Smithers responded by making some incriminating statements. Metzgar called Detectives Flair and Blake into the room and Flair and Blake continued the interview. Smithers again insisted that his wife be present during the interview. Smithers subsequently admitted that he killed Cristy Cowan and Denise Roach.
Smithers told the detectives the following version of events regarding the Cowan murder. Smithers was coming home from work when he spotted a car on the side of the road. He stopped to assist the driver (Cowan) and drove her to a convenience store. Once back in his truck, Cowan demanded money and threatened to accuse him of rape if he did not give her money. Smithers drove Cowan to the Whitehurst *920 property. Smithers gave Cowan all the money that he had but she still was not satisfied and she threw a drink at him. In response, he picked up an axe and struck Cowan in the head. She fell down unconscious and he dragged her to the pond. He returned to the carport to rinse off the axe when Whitehurst arrived. During the time that Whitehurst was there, he could hear Cowan making noises from the pond (Whitehurst testified that she never heard any sounds). When Whitehurst left, he went back to the pond and hit Cowan in the head "to shut her up." He also threw some tree limbs at her.
Later in the interview, Smithers explained to the detectives his involvement with the Roach murder. On May 7, Smithers was at the Whitehurst property mowing the lawn when Roach approached him. Roach told him that she had permission to be on the property. When Smithers returned to the Whitehurst property on May 13, Roach was still there. Smithers asked her to leave and she refused. Roach then hit Smithers on the arm and Smithers punched Roach in the face. Smithers said that Roach picked up a planter in the carport and threw it at Smithers' truck, causing a dent. Smithers shoved Roach against the wall, causing a piece of wood to fall down from a shelf and hit her on the head. Roach fell to the ground unconscious. Smithers left the property, but he returned the next day and dragged her body to the pond. He cleaned up the blood with mop and a bucket of water.
At the conclusion of the interview, Smithers was arrested and subsequently charged with two counts of murder. Prior to trial, the trial court denied Smithers' motion to sever the two charges and Smithers' motion to suppress his confession.
At trial, the medical examiner testified that at the time Cowan's body was discovered, she had not been dead for more than a couple of hours. There was a foam cone around her mouth which suggested that she might have drowned. Cowan had an injury to her eye, a laceration under her lip, a blunt impact injury to her jaw, a chop wound on the top of her head which penetrated her brain, and a chop wound behind her ear. She also had injuries consistent with manual strangulation. The medical examiner stated that death was caused by strangulation combined with the chop wounds.
Regarding Roach, the medical examiner testified that the body had been in the pond seven to ten days and was therefore very decomposed. There were two slits in Roach's clothing which were caused by a sharp instrument. Her face and skull were fractured. There were also sixteen puncture wounds to her skull, several of which penetrated the skull. Finally, she had injuries consistent with manual strangulation (the hyoid bone was fractured). The medical examiner stated that death was caused by the combined effects of strangulation, stab wounds, and blunt impact to the head.
The State presented the testimony of several witnesses who stated that both Cowan and Roach were prostitutes and worked in the same location (the Luxury Motel area). Prostitute Bonnie Kruse testified that she had previously "dated" Smithers at the Luxury Motel. Smithers offered Kruse extra money to go with him to Seffner, but she refused. Another prostitute testified that on the day Cowan disappeared, she gave her a condom. This condom was similar to the condom wrapper found inside the Whitehurst property.
Smithers testified during the guilt phase. His story at trial was different from the story he initially told the detectives. Smithers said that he lied to the detectives because he was scared that his *921 family would be harmed if he told the truth. Smithers told the jury that the incident actually began months earlier when he was a deacon at his church. A girl named Mimi was on probation and was fulfilling her community service requirement at the church. Smithers was Mimi's supervisor. Mimi, however, could not complete her hours and she therefore offered to have sex with Smithers if he would alter her records. He agreed. Weeks later, Smithers was approached by a man who was aware that Smithers was a caretaker at the Whitehurst property. Smithers did not know the man or his name (hereinafter Mr. X). Mr. X asked Smithers if he could use the property for a drug transaction. Mr. X had a picture of Smithers and Mimi. Mr. X said he would go public with the picture if Smithers did not cooperate. Smithers agreed to let Mr. X use the property. On two separate occasions, Mr. X contacted Smithers and asked Smithers to meet him at the property to unlock the gate. Several people were present during the first visit to the property, including Denise Roach. Roach got into an argument with Mr. X and Mr. X hit Roach in the head with a hatchet. Smithers claimed that he just stood and watched. Mr. X then approached Smithers and hit him with a tire tool. He ordered Smithers to drag Roach's body to the pond. Mr. X told Smithers that he would kill his family if he did not keep quiet. A week and a half later, Mr. X again asked Smithers to meet him at the Whitehurst property. This time Cristy Cowan was present. Several people went inside the house to conduct business. Afterwards, Mr. X ordered Smithers to go inside the house and clean up. When Smithers returned outside, Cowan's dead body was lying in the carport. Mr. X and his cohorts left and Smithers dragged the body to the pond and returned to clean up the carport. It was at this time that Mrs. Whitehurst arrived at the property.
At the close of all the evidence, the jury convicted Smithers of two counts of first-degree murder. During the penalty phase, the State presented Smithers' time card on the day of the Cowan murder, which showed that he left work at 5:23 p.m. The convenience store videotape from that same day indicated that Smithers and Cowan were present at 6:19 p.m. Detective Iverson testified that he was assigned to drive the distance from Smithers' place of work to the Whitehurst property, stopping in between at the place where Cowan was picked up (the Luxury Motel) and at the convenience store where Smithers and Cowan were seen on videotape. Detective Iverson left Smithers' place of work at 5:25 p.m. He arrived at the convenience store at 6:10 p.m. and arrived at the Whitehurst property at 6:17 p.m.
The defense presented the testimony of Smithers' two brothers, his former wife, his son, a local school principal, and a deputy from the detention facility where Smithers was housed during the trial. Smithers' brothers explained that Smithers was physically abused growing up. Smithers' mother would often hit her boys with a belt to "beat the devil out of them." Other witnesses explained that Smithers was a wonderful husband and father and that he never lost his temper with anyone. The deputy testified that Smithers was a model inmate. The defense also presented the testimony of three mental health experts. Apparently when Smithers was an infant, he fell out of his crib and landed on his head. When Smithers was twenty-seven, he was hit in the head with the butt of a shotgun during a robbery at a gas station where he worked. Dr. Wood testified that a PET scan of Smithers' head was abnormal and was consistent with brain damage due to head trauma. Dr. Berland testified that Smithers has a chronic mental illness and was suffering from extreme mental or emotional disturbance *922 at the time of the murders. Dr. Berland also said that Smithers had a substantial impairment in his ability to conform his conduct to the requirements of the law. Dr. Maher testified that Smithers was suffering from extreme mental or emotional disturbance at the time of the murders, that Smithers had a substantial impairment in his ability to conform his conduct to the requirements of the law, and that Smithers had a decreased ability to appreciate the criminality of his conduct.
In rebuttal, the State presented three mental health experts. Dr. Ikeman testified that the PET scan photographs were insufficient to diagnose whether Smithers' brain was functioning properly. Dr. Taylor stated that although Smithers had head injuries, the injuries did not cause brain damage. Dr. Taylor also testified that Smithers is not psychotic. Dr. Stein agreed that Smithers does not have a psychiatric disorder.
The jury ultimately recommended death sentences by a vote of twelve to zero. At the Spencer[2] hearing, John Cowan (Cristy Cowan's father) asked the trial court to impose a life sentence. Smithers' former wife made a similar request.
In the sentencing order, the trial court found the following three aggravators for the Cowan murder: (1) previous violent felony (contemporaneous murder), (2) the murder was especially heinous, atrocious, or cruel (HAC), and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and two aggravators for the Roach murder: (1) previous violent felony (contemporaneous murder) and (2) HAC. The trial court found the following two statutory mitigators: (1) the murder was committed while Smithers was under the influence of extreme mental or emotional disturbance (moderate weight) and (2) Smithers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also found the following nonstatutory mitigators: (1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crimes, but his trial testimony was in conflict with his statements to the detectives. All of the nonstatutory mitigators were given moderate weight. Finally, the court gave great weight to John Cowan's request that Smithers be given a life sentence. The trial court concluded that the aggravators outweighed the mitigators and therefore sentenced Smithers to death for both murders.
Smithers presents six claims in this appeal.[3] We address the guilt-phase claims first. In his first claim, Smithers contends that the trial court erred by denying *923 his motion to sever the two offenses. We disagree. The decision to grant or deny a motion for severance rests within the sound discretion of the trial court. See Fotopoulos v. State, 608 So.2d 784 (Fla. 1992). Denial of a motion for severance is reviewed for abuse of discretion. See Crossley v. State, 596 So.2d 447 (Fla.1992). Florida Rule of Criminal Procedure 3.150 states in pertinent part:
(a) Joinder of Offenses. Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses ... are based on the same act or transaction or on 2 or more connected acts or transactions.
In Wright v. State, 586 So.2d 1024, 1029-30 (Fla.1991) (quoting Garcia v. State, 568 So.2d 896, 899 (Fla.1990)) (citations omitted), this Court stated the following:
"[T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are connected only by similar circumstances and the accused's alleged guilt in both or all instances." Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence.
In Garcia v. State, 568 So.2d 896, 899 (Fla.1990), this Court explained that "the connected acts or transactions requirement of rule 3.150 means that the acts joined for trial must be considered in an episodic sense." Joinder is not warranted where the offenses are unrelated in terms of time or sequence. See Paul v. State, 385 So.2d 1371, 1372 (Fla.1980). There must be a "meaningful relationship" between the charges before permitting them to be tried together. See Ellis v. State, 622 So.2d 991, 999 (Fla.1993).
Previously, this Court has recognized two general categories of cases where joinder was proper. This Court's opinions in Bundy v. State, 455 So.2d 330 (Fla.1984), and Fotopoulos illustrate those two categories. In Bundy, the defendant attacked four women, killing two, in a Florida State University sorority house. Roughly an hour later, Bundy attacked a fifth woman in an apartment house several blocks away. This Court found that "the criminal acts [were] connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated." Bundy, 455 So.2d at 345. In Ellis, this Court characterized the Bundy crimes as "a classic example of an uninterrupted crime spree in which no significant period of respite separated the multiple crimes." 622 So.2d at 999.
In Fotopoulos, the defendant induced a woman to murder another man while he videotaped the shooting. He then used the video to blackmail the woman into hiring a hit man to murder his wife a month later. This Court found that since one crime induced the other crime, a sufficient causal link existed to permit joinder.
Thus, for joinder to be appropriate the crimes in question must be linked in some significant way. In the past this has meant that the crimes must have occurred during a "spree" interrupted by no significant period of respite (Bundy) or the crimes must have been causally related to each other, even though there may have been a significant lapse of time (Fotopoulos). But the mere fact of a general temporal and geographic proximity has not been sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes. See Ellis, 622 So.2d at 1000.
*924 In the present case, the trial court stated the following in its order denying Smithers' motion to sever:
[T]he two homicides, while separated in time by as many as 15 days, are connected acts or transactions in an episodic sense.
Additionally, it is likely that even if severed, evidence of one homicide would be relevant and admissible in a separate trial of the other homicide, pursuant to section 90.404(2), Florida Statutes, on the issue(s) of motive, opportunity, intent, preparation, plan, or knowledge.
Judicial economy is of no moment or concern to the Court, given that the State will seek a death penalty upon a conviction of either count.
It would be illogical to present evidence of the finding of Cristy Cowan's recently deceased body separate from evidence of the finding of Denise Roach's decomposed body. Both bodies were found at the same time at the same place.
The statements of the Defendant include first, his admission to killing Cristy Cowan, and later his admission to killing Denise Roach. These admissions are separated by several hours. It would be misleading to a jury to suggest to them, or to allow them to infer, that the Defendant was questioned for several hours before he admitted the homicide of Cristy Cowan, when in fact he initially admitted to the homicide of [Cowan], and then upon further questioning, admitted to the homicide of [Roach].
The two offenses occurred at the same location, within two weeks of each other, and were similar in nature and in the manner in which they were perpetrated. Both offenses involved victims who were prostitutes working in the same area who had sexual relations with the Defendant at the house where each was killed and where the body of each was found. Each was killed in a similar fashion.
(Citations omitted.) The facts of this case do not fit squarely into either the "spree" or "causal link" categories. This Court has allowed joinder when the crimes were separated by as much as three days, see Rolling v. State, 695 So.2d 278 (Fla.1997), but the crimes in the instant case were separated by seven to ten days. Further, although we agree with the State that Smithers' success in carrying out the first murder provided the impetus to repeat the crime, there is not a direct causal link between the two murders, at least not in the manner in which this Court described "causal link" in Fotopoulos (i.e., the first offense "induced" the second). Nevertheless, we find that joinder was appropriate in this case based on the unique facts of this record. Both victims were prostitutes, both were taken from the Luxury Motel to the Whitehurst property, both had sex with Smithers inside the house, both were murdered in a similar fashion in the carport with tools apparently located in the carport, and both bodies were dragged into a pond behind the house. Both murders were committed within a ten-day time frame. Finally, both bodies were discovered at the same time and the defendant confessed to both murders in the same interview. There is clearly a "meaningful relationship" between the two crimes and they are without question "linked in some significant way." Under these circumstances, we find that the trial court did not err in denying Smithers' motion to sever.
In his second claim, Smithers asserts that the trial court erred by denying his motion to suppress his confession. An appellate court should accord a presumption of correctness to a trial court's ruling on a motion to suppress with regard to the trial court's determination of historical *925 facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution. See Connor v. State, 803 So.2d 598 (Fla.2001).
Smithers offers three different grounds for suppressing the confession. We address each of these grounds in turn. First, Smithers argues that a detective used religious coercion to persuade him to confess. Smithers was questioned by law enforcement officials on the night that the bodies were discovered. After this initial interview, Smithers was returned to his home and was asked to come back the next morning to take a polygraph test. At the conclusion of the polygraph test, Detective Metzgar approached Smithers and stated the following:
And I knew that if he attended church of course, I'm a Christian and I explained to him that if he was a Christian and it was my belief based on the polygraph he wasn't telling the truth about this, that he might want to tell the truth about it, that that is probably the right thing to do.
Shortly thereafter, Smithers made some incriminating statements to Detective Metzgar (the record is not clear regarding the content of these statements). Smithers claims that Metzgar's statements were coercive because they were a blatant appeal to Smithers' religious beliefs.
In Walker v. State, 707 So.2d 300 (Fla. 1997), this Court considered a defendant's claim that the police used a number of coercive tactics to obtain a confession. This Court described one of the tactics as "knowing that Walker was a deacon in his church, police exploited his religious beliefs when they told him that God would not believe his `abduction' story." The Court affirmed the trial court's denial of the motion to suppress, finding that the record supported the trial court's conclusion that the confession was given freely and voluntarily.
In Hudson v. State, 538 So.2d 829 (Fla. 1989), this Court considered whether the so-called "Christian burial technique" rendered a confession involuntary:
At the suppression hearing the sergeant testified as to what he had said to Hudson:
... I then appealed to Mr. Hudson's emotions in regard to the fact that I asked him if he had ever been to a funeral. And, obviously, he responded "Yes." I asked him if he had ever been to a funeral without a body. He said he had not.
I then conveyed that most of us don't go to funerals without a body. And that for the family to put this situation to rest, due to the fact he had already advised us that he had seen the body, that the young lady was, in fact, dead, I was aware of that fact, I said, "The family has to know that. And the only way that he will ever know that is to observe and see the body."
This Court has characterized the Christian burial technique as "a blatantly coercive and deceptive ploy." Roman v. State, 475 So.2d 1228, 1232 (Fla.1985). As in Roman, however, we find the sergeant's reference to finding the body so that it could be buried insufficient to make an otherwise voluntary statement inadmissible. The police read Hudson his rights at least twice, and Hudson indicated that he understood them before waiving them. The only promise made to Hudson was that he would be taken away from the body's location as soon as possible. We agree with the trial court that this promise did not coerce Hudson's confession. We dis-agree *926 that police overreaching or coercive police conduct rendered Hudson's confession involuntary.
Id. at 830 (citation and footnote omitted). The present case is indistinguishable from Walker and Hudson. The detectives read Smithers his Miranda rights and he waived his rights. Smithers testified at the suppression hearing that he understood his rights. The record also reflects that Smithers graduated from high school. We do not find that Detective Metzgar's comments coerced Smithers' confession.
Next, Smithers claims that the detectives should have reread Smithers his Miranda rights after he made the incriminating statements to Detective Metzgar. We disagree. The detectives read Smithers his rights the previous night and he was given a written copy of his rights prior to the polygraph test. Smithers waived his rights on both occasions. Under these circumstances, it was not necessary for the detectives to reread Smithers his Miranda rights.
Finally, Smithers alleges that the detectives induced the confession by improperly using his wife as their agent during the interview. After Smithers made the incriminating statements to Detective Metzgar, Metzgar called Detectives Flair and Blake into the room and Flair and Blake continued the interview. Smithers insisted that his wife be present during the interview. Once inside the room, Smithers' wife encouraged Smithers to tell the truth. Smithers ultimately confessed to the crimes.
At a hearing on the motion to suppress, Smithers' wife testified that the detectives directed her to encourage her husband to talk. The detectives testified that they did not tell Smithers' wife to say anything to Smithers. In denying Smithers' motion to suppress, the trial court relied on this Court's decision in Lowe v. State, 650 So.2d 969 (Fla.1994). The facts of Lowe are as follows:
One week after the murder, two investigators that had been working on the case, Investigator Kerby and Sergeant Green, learned that Lowe and his girlfriend had gone to the Vero Beach Sheriffs Office to discuss a matter unrelated to the instant case. Already suspecting Lowe's involvement in the murder, Kerby and Green went to the sheriffs office where they separated Lowe and his girlfriend and, after Lowe had waived his Miranda rights, began to question him concerning the murder of Donna Burnell. Lowe denied any involvement in the murder and eventually invoked his right to counsel. The interrogation ceased and Lowe was left alone in the interrogation room. Neither Kerby nor Green bothered to put Lowe in contact with an attorney because, as they were to later testify, they did not expect to continue the questioning.
Throughout the interrogation, Lowe's girlfriend had been sitting in a nearby room and had overheard much of the conversation. She became emotional and was moved to another room. After Kerby and Green left Lowe, they went to the room where the girlfriend was waiting and, at her request, explained to her the extent of the evidence they had compiled against Lowe. The girlfriend stated to the investigators that she wanted to speak to Lowe to find out what happened. She also agreed to have her conversation with Lowe recorded. Kerby later testified that, although no one urged the girlfriend to speak to Lowe, he knew there was "a good possibility" that she was going to try to get Lowe to admit his involvement in the murder.
The girlfriend succeeded in convincing Lowe to speak to the police. When Kerby returned to the interrogation *927 room to get the girlfriend, Lowe, without prompting, told Kerby that he wanted to speak with him again. Lowe then gave the investigators a statement in which he confessed that he was the driver of the getaway car involved in the crime but denied any complicity in the murder, which he blamed on one of two alleged accomplices.
650 So.2d at 972 (footnote omitted). This Court in Lowe concluded that the trial judge did not err in admitting Lowe's incriminating statement because the police did not employ the girlfriend as an agent to coerce a confession from Lowe.
We agree with the trial court below that the detectives did not coerce Smithers into giving his confession. Importantly, it was Smithers, and not the detectives, who requested that his wife be present during the interrogation. Accordingly, it cannot be said that the detectives used Smithers' wife to coerce Smithers.
Finally, in Lukehart v. State, 776 So.2d 906, 920 (Fla.2001), this Court stated that when considering the validity of a confession, a reviewing court should consider the totality of circumstances surrounding the giving of the confession. After considering the totality of circumstances in the present case, including all of Smithers' alleged claims of error, we nevertheless find that Smithers' confession was given freely and voluntarily.
In Smithers' third claim, he contends that fundamental error occurred when defense counsel waived Smithers' presence at a pretrial hearing. On December 7, 1998, the trial court held a pretrial hearing on two of Smithers' motions in limine. Defense counsel orally waived Smithers' presence at the hearing.
In the first motion in limine, the defense sought to limit the showing of a video of the crime scene and the medical examiner reviewing the bodies. During the hearing, the State agreed with the defense that the video should be redacted to only show the crime scene. The trial court reserved ruling on this motion.
In the second motion, the defense sought to limit the testimony regarding Smithers' involvement with other prostitutes from the Luxury Motel. The defense claimed that this evidence was irrelevant and prejudicial. The State responded that one of the prostitutes (Bonnie Kruse) would testify that Smithers offered her money to go to Seffner with him. The State claimed that this was relevant to establishing why the victims were at the Whitehurst property and to explain Smithers' modus operandi. No witnesses testified during the hearing on the motion in limine. At the conclusion of the hearing, the trial court denied the motion. Smithers claims in this appeal that his absence during the second motion in limine amounted to fundamental error.
At trial, the State presented the testimony of three prostitutes who worked with the victims. Prior to the testimony, the defense renewed its objection to the admission of testimony concerning Smithers' sexual conduct. The trial court denied the motion.
Florida Rule of Criminal Procedure 3.180(a) states that "the defendant shall be present ... at any pretrial conference, unless waived by the defendant in writing." In Pomeranz v. State, 703 So.2d 465, 471 (Fla.1997), this Court held that the trial court erred in holding a pretrial conference in the absence of the defendant without an express written waiver. However, in Kearse v. State, 770 So.2d 1119, 1124 (Fla.2000), this Court stated that such violations are subject to harmless error analysis and the proceeding will only be reversed on this basis if "fundamental fairness has been thwarted."
The State claims that any error was harmless. The State relies on this Court's *928 opinion in Roberts v. State, 510 So.2d 885 (Fla.1987):
During the afternoon session of October 24, the following motions were considered: (1) The defendant's motion for a daily transcript of the trialdenied; (2) Defendant's motion to strike a/k/a on indictmentdenied, later granted; (3) Defendant's motion concerning death penalty questions during voir dire and to empanel a separate sentencing jurydenied; (4) Defendant's motion for psychological evaluation of Michelle Rimondigranted with limitations; (5) Defendant's request for presentence investigation ruling withheld; (6) Defendant's motion for list of sentencing witnesses and exhibitspassed with court's comment that defendant had an "absolute right" to that information; (7) Defendant's motion to reopen depositions of Rimondi and othersgranted with limitations; (8) Defendant's motion to prohibit dispersal of jury during recess granted; (9) Defendant's motion to seek sequestration of juryruling withheld; (10) Defendant's motion concerning comments on his right to counsel granted. During the December 2 conference the following motions were heard: (1) The defendant's motion to reopen the deposition of Denise Moon, Rimondi's rape counselordenied; (2) Defendant's motion to restrict use of other crime evidencegranted; (3) Defendant's motion for release of grand jury transcriptdenied; (5) State's motion to limit cross-examination of state witness Campbellgranted; (6) State's motion to limit cross-examination of state witness Rimondigranted; (7) State's motion to limit inquiry into Rimondi's social historyruling reserved, eventually granted. Although a number of the rulings on these motions were adverse to Roberts, each of the motions heard during these sessions involved matters in which Roberts, if present, could not have assisted defense counsel in arguing. Therefore, we find that the state has met its burden in showing that, if in fact the defendant was not present during these proceedings, he was not prejudiced.
Id. at 891 (emphasis added).
We agree with Smithers that the trial court erred in holding the pretrial motion in limine hearing in his absence without an express written waiver. Nevertheless, we find the error harmless as we do not find that fundamental fairness was thwarted due to Smithers' absence. No witnesses testified during the hearing in question. It is doubtful that Smithers' input would have impacted the trial court's ruling on the motion. Further, the trial court's ruling on the motion was correct, as Kruse's testimony regarding Smithers' offer to go to Seffner was relevant to the State's case. Finally, Smithers was present at trial when all of the witnesses in question testified; hence, Smithers was not denied the opportunity to voice any concerns.
After reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Smithers' convictions for first-degree murder. The remainder of the alleged claims of error concern the penalty phase.
In claim four, Smithers challenges the trial court's finding of HAC for the Roach murder. A trial court's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence in the record. See Almeida v. State, 748 So.2d 922, 932 (Fla.1999). In order for HAC to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). A finding of HAC is appropriate only when a murder evinces extreme and outrageous *929 depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. See Cheshire v. State, 568 So.2d 908, 912 (Fla.1990).
The record demonstrates that although Smithers and Roach had sex inside the Whitehurst house, Roach was murdered in the carport. Blood stains on the carport wall were consistent with Roach's DNA. The medical examiner testified that Roach's death was caused by the combined effects of strangulation, stab wounds, and blunt impact to the head. There were two slits in Roach's clothing which were caused by a sharp instrument. Her face and skull were fractured due to multiple blunt impact wounds. There were also sixteen puncture wounds to her skull, several of which completely penetrated the skull. Finally, she also had injuries consistent with manual strangulation (the hyoid bone was fractured).
Smithers told the detectives that he got into an argument with Roach that resulted in him hitting her several times. Smithers testified at trial that someone else killed Roach, but as the trial court points out in its sentencing order, this testimony was rejected by the jury. Based on this record, there is competent, substantial evidence to support HAC.
In claim five, Smithers challenges the trial court's finding of CCP for the Cowan murder. In order to prove the existence of the CCP aggravator, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill." Bell v. State, 699 So.2d 674, 677 (Fla.1997). The State attempted to prove this aggravator for the Cowan murder by establishing that Smithers murdered Roach in a similar fashion in the previous seven to ten days. The trial court stated the following in the sentencing order:
When Samuel Smithers drove Cristy Cowan to the property, he knew that he had killed Denise Roach; he knew that her body was still on the property; he knew that he had only $26 on his person to pay for sex; he locked the gate behind him after he drove onto the property. His premeditated design to kill Cristy Cowan was heightened beyond a reasonable doubt. His actions demonstrated a cool and calm reflection.
The State's argument is strengthened by the fact that the murder was not committed during sex, as the condom wrapper that Cowan was carrying was found in the house but Mrs. Whitehurst saw a pool of blood in the carport. Thus, the case is distinguishable from those cases where the victim was killed while the victim and the defendant were engaged in sexual activity. See, e.g., Randall v. State, 760 So.2d 892 (Fla.2000) (holding that evidence of defendant's history of choking women to heighten sexual arousal did not prove premeditation). The State's argument is further strengthened by the identical manner in which the two murders were committed. Both women were prostitutes, both were picked up at the same location and taken to the Whitehurst property, and, after having a sexual encounter with Smithers, both were lured into the carport, seemingly murdered with tools kept in the carport, and then dragged into the same pond. The time between the murders was a matter of days. Had Smithers only intended to have sex with Cowan, there would have been no need to leave the Luxury Motel. Rather, when Smithers picked up Cowan and asked her to come with him to the Whitehurst property, he was taking the first step towards committing the same crime that he committed just days earlier, and the same location was accessible, the same murder weapons were already in place, and the same hiding place existed for the body.
*930 This case is distinguishable from Crump v. State, 622 So.2d 963 (Fla.1993). In Crump, the police found the nude body of a prostitute in an open area adjacent to a cemetery in Tampa. An initial examination of the body showed that the woman had been manually strangled and had ligature marks on her wrists consistent with being bound. Ten months later, the police found the nude body of another prostitute in an open field adjacent to a different cemetery in Tampa. The second woman also had been manually strangled and had ligature marks on her wrists consistent with having been bound. Crump was linked to both murders. On appeal, his Court held that the trial court erred in finding CCP for the second murder:
In the sentencing order, the trial judge relied on the Williams v. State, 110 So.2d 654 (Fla.1959) rule evidence to show that heightened premeditation exists. We find that the State did not prove beyond a reasonable doubt that Crump had a careful prearranged plan to kill the victim before inviting her into his truck.
Id. at 972 (footnote omitted). Although the two murders in Crump were committed in a similar manner, they were not identical, as the two women were discovered in different locations. Further, in comparison to the instant case, there was a substantial amount of time separating the two crimes in Crump.
For all of these reasons, we find no merit to Smithers' CCP claim. There is competent, substantial evidence in the record to support the existence of the CCP aggravator for the Cowan murder.
In claim six, Smithers alleges that the trial court erred by failing to declare a mistrial during the penalty phase when one of the State's witnesses testified regarding Smithers' lack of remorse. During the penalty phase of the present case, State witness Dr. Stein, a forensic psychiatrist, stated the following:
Q. And what psychiatric diagnosis did you make on Mr. Smithers?
A. Well there really is not a psychiatric diagnosis because there is not a psychiatric disorder. Mr. Smithers based on all the evidence in the case that I reviewed has what we call antisocial personality traits. Those are personality traits that are characterized by a person being likely to be deceptive and to lie, to have lack of remorse for others, to be what we call....
Defense counsel immediately objected and requested a mistrial. The trial court denied the motion but instructed Dr. Stein to refrain from referring to lack of remorse. Lack of remorse was not mentioned again either by the witness or by the State.
A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be "granted only when it is necessary to ensure that the defendant receives a fair trial." Gore v. State, 784 So.2d 418, 427 (Fla.2001). The use of a harmless error analysis under State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), is not necessary where "the trial court recognized the error, sustained the objection and gave a curative instruction." Gore, 784 So.2d at 428. Instead, the correct appellate standard of review is abuse of discretion. See id.
In Shellito v. State, 701 So.2d 837, 842 (Fla.1997), this Court stated that lack of remorse is a nonstatutory aggravating circumstance and cannot be considered in a capital sentencing. However, the Court further stated that "the brief reference to lack of remorse was of minor consequence and constituted harmless error." Id.
Similarly, in the instant case, Dr. Stein's brief reference to lack of remorse was of minor consequence, especially in light of *931 the fact that the State did not mention lack of remorse in its closing argument. Hence, the trial court did not abuse its discretion in denying Smithers' motion for mistrial.
Finally, although Smithers raises no argument concerning proportionality, this Court must address this issue pursuant to its constitutional mandate. See art. I, § 17, Fla. Const.; Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In the sentencing order, the trial court found the following three aggravators for the Cowan murder: (1) previous violent felony (contemporaneous murder), (2) HAC, and (3) CCP; and two aggravators for the Roach murder: (1) previous violent felony (contemporaneous murder) and (2) HAC. The trial court found the following two statutory mitigators: (1) the murder was committed while Smithers was under the influence of extreme mental or emotional disturbance (moderate weight) and (2) Smithers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also found the following nonstatutory mitigators: (1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crime, but his trial testimony is in conflict with his statements to the detectives. All of the nonstatutory mitigators were given moderate weight. Finally, the court considered the statements of John Cowan (Cristy Cowan's father), who requested that Smithers be given a life sentence. This was given great weight by the trial court.
A comparison to this Court's prior cases reveals that the death penalty has been upheld in cases involving similar aggravating and mitigating circumstances. See Pope v. State, 679 So.2d 710 (Fla.1996) (finding death sentence proportionate for beating and stabbing death of girlfriend where there were two aggravatorsprevious violent felony conviction and pecuniary gain, both statutory mental mitigators, and nonstatutory mitigators); Orme v. State, 677 So.2d 258, 263 (Fla.1996) (finding death sentence proportionate for beating and strangulation of victim in a motel room where there were three statutory aggravators HAC, pecuniary gain, and sexual batteryand both statutory mental mitigators). Therefore, the sentences of death are proportionate in this case.
Accordingly, for the reasons stated in this opinion, we affirm the convictions for first-degree murder and the sentences of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs as to the convictions and concurs in result only as to the sentences.
PARIENTE, J., concurs in result only.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Smithers presents the following claims: (1) the trial court erred by denying Smithers' motion to sever the two offenses; (2) the trial court erred by denying Smithers' motion to suppress his confession; (3) fundamental error occurred when defense counsel waived Smithers' presence for the pretrial motion in limine hearing; (4) the trial court erred in finding HAC for the Roach murder; (5) the trial court erred in finding CCP for the Cowan murder; and (6) the trial court erred by failing to declare a mistrial during the penalty phase when one of the State's witnesses introduced lack of remorse as a consideration.