906 So.2d 1171 (2005)
Paul McNAMEE, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-3206.
District Court of Appeal of Florida, Fourth District.
June 29, 2005.
Rehearing Denied August 11, 2005.
*1172 Robert G. Udell, Stuart, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.
MAY, J.
The defendant appeals his conviction and sentence on two counts of premeditated first degree murder, one count of robbery with a firearm, one count of burglary of a dwelling while armed, and one count of grand theft of a firearm. He raises several issues concerning the trial court's denial of his motions to suppress. We affirm.
On a Friday afternoon, Officer Kryak responded to the scene of a double murder, where he received a description of the suspect: a white or Hispanic male, average size, thin build, wearing a striped shirt. The suspect was seen running from the scene. Officer Kryak began to drive his car in the direction the suspect had taken.
Other officers established an outer perimeter at key intersections to look for the suspect and identify witnesses. Those officers stopped a vehicle in which the defendant was a passenger. The officers completed interview cards on the three occupants, which included their names, ages, dates of birth, social security numbers, addresses, heights, weights, scars, marks, and tattoos. They were then allowed to leave.
Meanwhile, the detective who responded to the murder scene observed the two victims with gunshot wounds to the back of their heads, seated in the front seat of a parked car. The detective obtained one victim's name by running the license tag on the car. The second victim had a student identification card from Port St. Lucie High School.
The detectives found a cell phone in the console of the car and began logging the numbers from the most recent calls. One of the calls was from the defendant.
The police worked with one of the eyewitnesses to develop a composite sketch of the suspect, which was then aired on the news. Later that night, a Port St. Lucie High School student called 911 to advise the police that the composite sketch looked like the defendant, Paul McNamee.
Because one of the victims was a student at Port St. Lucie High School, the school resource officers became involved in the investigation. They looked through yearbooks trying to find matches for the composite sketch. One of the officers recalled that the defendant had been wearing similar clothing on the day of the murders. He also believed the defendant may have been captured on the video surveillance system at the school.
Between the time of the murders and early Saturday morning, one of the detectives obtained the school surveillance videotape. It showed the defendant wearing a striped shirt in school that day. The detectives then pulled the defendant's driver's license information and photo. Persons involved in the investigation commented that the composite sketch looked like the photo on the defendant's driver's license.
The police first interviewed the defendant at 1:26 a.m. on Saturday. Before the police spoke to the defendant, another witness told the detective that one of the victims had been trying to get involved in a drug deal with the defendant. The defendant told this witness he was going to *1173 steal a gun and Goldschlager from a neighbor.
The police released the defendant after his first interview. Subsequently, a neighbor of the defendant called 911 and reported the defendant had asked him to show him where he could discard a gun in the river behind the neighbor's house. He witnessed the defendant throw the gun in the river.
The police obtained and executed a search warrant at the defendant's father's home. One of the officers executing the search warrant noticed a piece of clothing from the faith-based group, the "Royal Rangers." That officer spoke with the defendant about his involvement with the group and shared that information with the detectives.
With the knowledge of both parents, the defendant went to the police station again on Saturday evening. He was again read his rights and spoke to the police for a couple of hours. Everyone was tired and the defendant agreed to return to the police station on Sunday afternoon.
Between the Saturday evening and Sunday afternoon interviews, the defendant's neighbor directed the police to the location of the discarded gun. Divers recovered the gun and a bottle of Goldschlager from the river on Sunday morning. The police determined both items had been stolen in the recent burglary of a nearby home. Ballistics confirmed the recovered gun was used in the murders. On Sunday morning, the police also interviewed another individual, who told them he was at the defendant's house earlier in the week when the defendant tried to sell him a gun that fit the description of the recovered gun.
According to her testimony, the defendant's mother spoke to one of the detectives on Saturday night and told him if they were going to keep the defendant for questioning, she needed to get an attorney for him. She claimed the detective told her the defendant did not need an attorney because he had not been charged. She gave the detective her cell phone number. Although refuted by the officer's testimony, she denied knowledge that the officers wanted to speak with her son the next day.
On Sunday, the defendant's mother went to the police station. She claimed to have continuously tried to contact the detectives using her cell phone, but no one answered. She also claimed to have asked to speak with her son because he was just a kid.
At 10:00 p.m. on Sunday, one of the detectives came downstairs. The defendant's mother told him she wanted to see the defendant, but he told her they could not release the defendant because they were going to charge him. The detective advised he would have the defendant call her. The defendant called his mother sometime between 2:30 and 3:00 a.m. on Monday.
The defendant moved to suppress his driver's license. He also moved to suppress his confession on a number of grounds. The trial court denied both motions.
At trial, the defendant testified concerning his gang affiliation, gang-related drug sales, and drug use. The defendant stated he brokered a drug deal with the victims. He knew the drug deal was about to happen when the victims picked him up.
The defendant admitted being in the car at the time of the murders, but claimed he did not pull the trigger. He claimed the other party to the drug deal was the actual shooter. According to the defendant, during the transaction the shooter pulled the pistol he had purchased from the defendant and shot one of the victims. At this point, the defendant jumped out of the car and ran away. The defendant also claimed, the shooter came to his house *1174 after the murders, and gave him the pistol and $400 to get rid of it.
The jury returned guilty verdicts on all counts. With regard to the first degree murder charges, the jury found the defendant guilty of premeditated and felony murder. The trial court sentenced the defendant to life without parole on Counts I-IV and five years on Count V.
The defendant argues the evidence obtained from the vehicle stop on Friday should have been suppressed because it was the product of an illegal roadblock. He argues the police roadblock failed to comply with Campbell v. State, 679 So.2d 1168 (Fla.1996), which requires written guidelines that comply with the Fourth Amendment prior to the establishment of a roadblock. We are fully aware of Campbell, but find the vehicle stop in this case does not fall within its mandate.
Here, the officers set up a perimeter and stopped the car in an attempt to preserve evidence and witnesses. The officers briefly spoke to the defendant and the other occupants, obtained identification, and let them go. "The narrow focus ... was to secure a crime scene so that evidence of a criminal act might not be destroyed." See Harbaugh v. State, 711 So.2d 77, 80 (Fla. 4th DCA 1998). In such cases as this one, the exigent nature of the circumstances distinguishes the stop from a DUI or traffic safety roadblock. Because "[s]ociety has a great interest in the apprehension of those who criminally shoot people," written guidelines are not required in these circumstances. Id. The trial court correctly denied the motion to suppress the defendant's driver's license.
The defendant next argues the trial court erred when it denied his motion to suppress his statements made before and after he was arrested for burglary because they were coerced and involuntary. He claims he invoked both his right to counsel and right to consult with his parents, which were ignored. He also claims the officers' techniques were coercive. We disagree with him in all respects.
Whether a juvenile's confession is voluntary is determined based upon the totality of the circumstances. Brancaccio v. State, 773 So.2d 582 (Fla. 4th DCA 2000). When considering a trial court's decision on a motion to suppress, we accept the trial court's findings of fact, but review de novo the trial court's application of the law. See Chapman v. State, 780 So.2d 1036 (Fla. 4th DCA 2001).
After considering the totality of the circumstances, the trial court made the following findings of fact and legal conclusions.
Concerning the statements obtained from Paul McNamee before the formal word of arrest, looking at the totality of the circumstances, Paul McNamee['s] age and relative normal sophistication for a sixteen year old. The fact that he can stop the interrogation any time he wants and, in fact, does stop on Saturday when he's tired. He never asked for a lawyer. His parents know where he is. The parents never ask to be present. The parents never ask for the interrogation to stop. The parent never obtain[s] a lawyer. All of Paul McNamee's physical needs are cared for. There's [sic] never any threats or promises. Paul understands the Miranda warnings and agrees to talk. I find the statements obtained from him pre-formal arrest are not illegally obtained.
With regard to the defendant's first interview early Saturday morning, the trial court found he had been advised of his rights per Miranda, he was in full possession of his faculties, was not promised or threatened, and agreed to talk. The trial court noted the defendant was then released.
*1175 The defendant voluntarily returned to the police station on Saturday after his father told him to "tell the truth." The trial court found the defendant was in full control of his faculties, and that no promises or threats were made. He was again released to his mother with the understanding the police wanted to continue the interview on Sunday. The defendant's mother took him to his father's house, where he spent the night.
The trial court found the detective contacted the defendant's mother on Sunday, and learned the defendant had spent the night at his father's house. The detective went to the defendant's father's house. The defendant's friends then drove him to the police station where the third interview began at approximately 2:33 p.m. Both of the defendant's parents were aware the defendant was back at the police station.
The defendant contends the police violated section 985.207(2), Florida Statutes (2001). However, that section simply requires notification to the parents when a child is in custody. The purpose of the statute is to advise the parents of a juvenile's whereabouts. See Villar v. State, 441 So.2d 1181 (Fla. 4th DCA 1983).
Here, both parents knew at all times when the defendant was at the police station. They both had multiple opportunities to speak to the defendant before the first Saturday interview, again before the second Saturday interview, and once again between the Saturday and Sunday interviews. After considering all of the testimony at the motion to suppress hearing, the trial court specifically found neither the son nor the mother requested to speak with one another during the Sunday interview. We hold the trial court correctly concluded the parental notification statute was not violated.
The defendant raises two additional concerns. He suggests he was denied his right to counsel. And, he argues he was improperly coerced into confessing by the detective's references to the Bible. With respect to the defendant's suggestion that he requested to speak with counsel, the trial court made a factual finding that the defendant never made an unequivocal request for counsel. When a suspect's request is ambiguous or equivocal, the police do not have a duty to clarify the suspect's intent before proceeding with the interrogation. State v. Owen, 696 So.2d 715 (Fla.1997).
On the issue of law enforcement's reference to the Bible, we find no improper conduct on the part of law enforcement. The detectives had noted clothing belonging to the defendant that related to a religious group with which the defendant was affiliated. The defendant's father encouraged his son to tell the truth. Then, during the Sunday interview, the detective read a short passage from the Bible, and told him, "the truth shall set you free." It was at this point the defendant stated, "I did it." "I killed two people." The record simply does not support that law enforcement's religious references improperly coerced the defendant's confession, rendering it inadmissible. See Smithers v. State, 826 So.2d 916 (Fla.2002).
The record and the case law support the trial court's determination that the defendant's confession was knowing and voluntary. We therefore affirm his convictions and sentence.
WARNER and GROSS, JJ., concur.