995 So.2d 613 (2008)
Justin ESTRICH, Appellant,
v.
STATE of Florida, Appellee.
No. 4D07-3899.
District Court of Appeal of Florida, Fourth District.
November 26, 2008.
*614 Carlos A. Canet of Law Office of Carlos A. Canet, Fort Lauderdale, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Mitchell A. Egber, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
In this case, the trial court allowed the state to present evidence of the defendant's marijuana use in a prosecution for DUI manslaughter based entirely on the defendant's ingestion of Xanax. We hold that the trial court abused its discretion in admitting the marijuana evidence and in failing to sever a misdemeanor marijuana possession charge from the manslaughter charge.
On December 5, 2005, Justin Estrich was involved in a serious, two car crash at the intersection of Jog Road and Brentwood Boulevard in Palm Beach County. The driver of the other vehicle, America Babilonia, died at the scene. Estrich had been travelling north on Jog Road; the other driver was heading west on Brentwood Boulevard and was in the process of making a left turn to go south on Jog Road. After the impact, Estrich's vehicle travelled about 210 feet north of the intersection and pulled over into a left hand turn lane.
No one witnessed the collision. Christopher Cannan, a bystander, went to Estrich's car after it came to a stop. Cannan asked Estrich to shut off the car and observed him "fiddling with stuff on the dashboard." Cannan testified that Estrich was emotional, did not respond to his questions, and made random statements, but could not recall whether his speech was slurred. Having an EMT certification, Cannan opined that Estrich's behavior was more consistent with a person under the influence rather than someone in shock. However, Cannan conceded that it was possible that the observed behavior, including Estrich's puffy eyes and confusion, *615 could be manifestations of closed head trauma.
Sergeant William Bruffey, an off-duty police officer, arrived at the scene and approached the vehicle. Sergeant Bruffey thought that Estrich was disoriented; as Estrich fumbled with the dashboard and steering wheel, and did not appear to understand what the officer was saying. The sergeant thought that Estrich was under the influence, but also considered that he may have been in shock or suffering from other medical problems. Sergeant Bruffey found two prescription bottles labeled with Estrich's name in the front area of the car. One of the paramedics handed him a third bottle containing marijuana that had been found in Estrich's pocket. Sergeant Bruffey testified that he could not determine whether appellant's conduct was attributable to closed head trauma or whether it was consistent with someone who was high on drugs.
Paramedic Jean-Antoine Pierre treated Estrich at the scene of the accident and transported him to JFK Hospital. Pierre conducted a head-to-toe assessment, and determined that although Estrich did not seem to be injured, in light of the seriousness of the car accident, and the death of the other driver, he should be taken to the hospital. Pierre applied the criteria set forth by the Glasgow Coma Scale and noted that Estrich appeared to be disoriented. As part of a protocol, Pierre administered the drug Narcan which treats potential opiate or narcotic use. Estrich told Pierre that he had ADHD and heart palpitations and was taking Xanax for anxiety. After the paramedics found the bottle of marijuana, Pierre asked Estrich whether he had taken it, to which appellant replied "No."
After speaking with Sergeant Bruffey and witness Cannan at the accident scene, Investigator Troy Snelgrove went to the hospital to question Estrich. At trial, Snelgrove described his observations when he met Estrich: "At first I noticed that he wasn't severely injured. I mean he had some cuts and abrasions on him. I also noticed that his eyes were glassy. When he spoke his speech was slurred and mumbled. He looked extremely impaired. Based on my training and experience he probably looked more impaired than anybody I've ever seen before." Further, Snelgrove thought appellant's movements were slow, that he did not appear confused, and that he exhibited mood swings. Regarding the mood swings, Snelgrove stated: "He would cry and then he would stop crying and he just seemed to get upset and then he would be fine." These observations led Snelgrove to believe that Estrich was impaired by something.
After reading him his Miranda warnings, the police obtained a taped statement from Estrich. He stated that he was color blind, but was able to see the lights, and that the light in question was yellow. He was not familiar with the area. He explained that he drove away from the crash site because he was trying to pull over as far as he could. Estrich said that he did not drink alcohol and that his girlfriend had broken up with him. He stated that earlier that day he had taken Adderall to study, but denied taking any kind of narcotics or drugs. When asked about the Xanax pills found in his car, Estrich said that he took 25 milligrams of Xanax at night before going to sleep. He also acknowledged the marijuana in his car and indicated that he had smoked a bowl the night before.
Chemical analysis of Estrich's blood showed the presence of 39 nanograms of marijuana metabolite Delta 9 Carboxy THC and 139 nanograms of Alprazolam, the generic form of Xanax.
*616 The state charged Estrich with DUI manslaughter, leaving the scene of a crash involving a death,[1] and possession of less than 20 grams of marijuana. Under section 316.193(3), Florida Statutes (2007), the gist of the DUI manslaughter charge, as it applied in this case, is that the defendant operated a vehicle while under the influence of a controlled substance to the extent that his normal faculties were impaired, and that as a result of such operation, caused or contributed to causing the death of a human being.
Before trial, the defendant moved to sever the marijuana charges from the driving offenses. He also argued for the exclusion of testimony about the marijuana metabolite in his blood, contending that such evidence was unfairly prejudicial. The circuit court denied both motions.
At trial, the defendant vigorously contested that he was impaired by Xanax at the time of the crash. He contended that a closed head trauma explained the indications of impairment observed by the state witnesses. There was testimony that Xanax is a prescribed medication designed to alleviate anxiety disorder and panic attacks. The defendant pointed to testimony that, over time, patients develop a tolerance to the adverse side-effects of the medication. Experts testified that therapeutic levels of Xanax have been reported as high as 272 nanograms; a therapeutic level was defined as a concentration at which a medication would have its peak beneficial effect without the manifestation of adverse side-effects. The defendant argued that he had developed a tolerance to Xanax as a result of his use of the prescribed medication over time.
The jury found Estrich guilty of the lesser included offense of misdemeanor driving under the influence, not guilty of leaving the scene of a crash involving death, and guilty of possession of less than 20 grams of cannabis.
We first address the circuit court's denial of the defendant's motion in limine, which sought to exclude any reference to the presence of the marijuana metabolite Delta 9 Carboxy THC in his blood sample. Every expert witness at the trial and at the hearing on the motion in limine stated that the presence of the marijuana metabolite in the defendant's blood sample likely would not have affected him at the time of the accident. For example, Dr. Jesse Bidanset, the state's board certified forensic toxicologist, testified on direct examination that the presence of the marijuana metabolite in the defendant's blood would "probably not" have affected the defendant at the time of the crash, explaining that "[t]he metabolite can circulate for literally days after using marijuana. And so the fact that it is the metabolite and not the parent drug would lead me to conclude that there [would] be relatively little impact of that as opposed to what I consider to be a significant impact of [Xanax]."[2] *617 Focusing on Xanax as the cause of the defendant's impairment, the state conceded in closing argument that the marijuana metabolite in the defendant's blood did not contribute to the crash.
"[R]elevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. (2007). Evidence is "relevant" if it tends "to prove or disprove a material fact." § 90.401, Fla. Stat. (2007). The presence of the marijuana metabolite, if relevant, was only barely so. The material fact at issue was the defendant's impairment at the time of the crash. The only evidence at trial was that the defendant's marijuana use "probably" did not affect him at the time of the collision. On the scale of relevancy, such tenuous probative value was "substantially outweighed by the danger of unfair prejudice, confusion of issues, [or] misleading the jury." § 90.403, Fla. Stat. (2007). The heart of the state's case was the drug Xanax. The evidence of marijuana metabolites in the defendant's blood raised the spectre of illegal drug use, a fertile source of prejudice in the eyes of the jury.
This case is close to State v. McClain, 525 So.2d 420, 422 (Fla. 1988), in which the Florida Supreme Court held that evidence of a trace amount of cocaine in the defendant's blood was too prejudicial to admit in a vehicular manslaughter case, where alcohol was the cause of the driver's impairment.
In McClain, the defendant was charged with vehicular manslaughter while intoxicated. Id. at 421. Analysis of the defendant's blood conducted after the accident revealed a blood alcohol level of .14 and a trace of cocaine. Id. The defendant moved in limine to exclude all reference to the presence of cocaine and introduced the deposition of a chemist which stated that because the amount of cocaine was so small, it was not possible "to state whether or not the presence of cocaine could have affected the manner of defendant's driving." Id. The Florida Supreme Court affirmed the trial court's order excluding the evidence; the court used a section 90.403 balancing approach to conclude that the minute probative value of the cocaine trace was outweighed by the danger of unfair prejudice:
[I]t is clear that the probative value of the evidence of cocaine in [defendant's] blood was minimal. The amount of cocaine was so small that the chemist could express no opinion with respect to whether it would have had any effect at all upon [defendant's] driving. On the other side of the scales, [defendant] could have been seriously prejudiced in the eyes of the jury if it became known that he had ingested even a trace amount of cocaine.
McClain, 525 So.2d at 422.
We followed McClain in West v. State, 553 So.2d 254 (Fla. 4th DCA 1989), disapproved on other grounds, State v. Norstrom, *618 613 So.2d 437, 439 (Fla.1993). West involved a prosecution for alcohol-based DUI manslaughter. Over objection, the state introduced evidence of a trace amount of valium in the defendant's blood. West, 553 So.2d at 255. Because the "expert testimony was [that] the valium had no measurable effect on [the defendant's] driving," we held that the valium evidence had "no probative value or relevance to the charge of driving under the influence of alcohol" and that it was "unfairly prejudicial." Id.
Applying McClain and West, we hold that probative value of the marijuana metabolite in the defendant's blood was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion by denying the defendant's motion in limine. We reject the state's invitation to find the error harmless; the state cannot show "beyond a reasonable doubt that there was no reasonable possibility that the error complained of contributed to the verdict." Myles v. State, 967 So.2d 450, 453 (Fla. 4th DCA 2007); State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Next we consider the claim that the trial court erred in denying the defendant's motion to sever the misdemeanor possession of marijuana charge from the DUI manslaughter charge. The applicable standard of review of a trial court's denial of a motion to sever is abuse of discretion. See Smithers v. State, 826 So.2d 916, 922-23 (Fla.2002); Fotopoulos v. State, 608 So.2d 784 (Fla.1992).
The circuit court denied the motion, ruling that the marijuana possession charge and the DUI manslaughter charge were based on two or more "connected acts or transactions" under Florida Rule of Criminal Procedure 3.150(a), so that they were properly joined together. The court reasoned: "[T]he fact that the defendant's statement that he was smoking marijuana the night before, that there is an accident the next morning, that they do find marijuana in his possession, you don't think that that's somewhat linked together?"
The trial court failed to adequately consider the ground for severance in Florida Rule of Criminal Procedure 3.152(a)(2)(A), that a severance is "appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Preventing an improper joinder is important under rule 3.152(a)(2)(A) because "evidence relating to each of the crimes may have the effect of bolstering the proof of the other." See Dupree v. State, 705 So.2d 90, 95 (Fla. 4th DCA 1998) (quoting Crossley v. State, 596 So.2d 447, 450 (Fla.1992)); see also Rodriguez v. State, 909 So.2d 547, 550 (Fla. 4th DCA 2005). In other words, "[w]hile the testimony in one case standing alone may be insufficient to convince a jury of the defendant's guilt, evidence that the defendant may have also committed another crime can have the effect of tipping the scales." Id.
In this case, the contested issue was whether the defendant was impaired by Xanax at the time of the accident. According to the evidence at trial, the defendant's marijuana use did not contribute to his impairment. Allowing the jury to hear that the defendant possessed .95 grams of marijuana had a prejudicial effect on the trial of the manslaughter charge. There was a significant risk that evidence of the defendant's possession of an illegal drug would bolster the state's contention that yet another drug impaired the defendant's ability to drive. The circuit court abused its discretion in denying severance and on retrial the DUI charge shall be severed from the marijuana possession charge.
For the remaining issues on appealthe denial of the motion to suppress blood test results and the trial court's refusal to admit *619 testimony about an experimentwe find no error.
Reversed and remanded for the court to sever the remaining charges and conduct new trials.
SHAHOOD, C.J., and FARMER, J., concur.
NOTES
[1] Section 316.027, Florida Statutes (2007) provides in pertinent part:

The driver of any vehicle involved in a crash occurring on public or private property that results in the death of any person must immediately stop the vehicle at the scene of the crash, or as close thereto as possible, and must remain at the scene of the crash until he or she has filled the requirements of section 316.062. Any person who willfully violates this paragraph commits a felony of the third degree.
[2] At the motion hearing on the motion in limine, defense witness, Dr. Stefan Rose, described the chemical process of marijuana in the body and expressed conclusions similar to those of Dr. Bidanset:

[G]enerally, when marijuana is smoked the THC from the smoke rapidly is transferred from the lungs into the bloodstream. Then, also rapidly, the THC is distributed throughout the bloodstream for about an hour or so as it enters, as it leaves the bloodstream and then goes into the other organs [including the brain] and fat tissue.... That process in a single dose of marijuana given to human beings take places in about an hour or so. The production of the inactive Metabolite Carboxy THC rises fairly slowly, and then reaches what might be thought of as a plateau blood concentration and stays at that concentration for a relatively long period of time in comparison to THC.... [T]he Carboxy THC[,] because it stays in the blood for a long period of time can remain from previous episodes of having smoked marijuana, whereas the THC will not be seen. So the presence of Carboxy THC in the blood is not always an indicator and may not be an indicator of recent marijuana use.... THC is the active compound in marijuana that... affects the brain.... It has a biologic effect.... Carboxy THC is the metabolite that does not possess the same biologic activity as THC, does not cause impairment, does not cause the things that THC causes.