36 So.3d 613 (2010)
Eugene W. McWATTERS, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-51.
Supreme Court of Florida.
March 18, 2010.
Rehearing Denied June 2, 2010.
*619 Carey Haughwout, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, Lisa-Marie Lerner and *620 Jason Pollack, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Eugene Wayman McWatters, Jr., was convicted of three counts of first-degree murder and three counts of sexual battery with great force arising from the 2004 strangulation murders of Jackie Bradley, Christal Wiggins, and Carrie Ann Caughey. McWatters was sentenced to death for each murder. This case is before the Court on appeal from the convictions and death sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences.

I. FACTS AND PROCEDURAL HISTORY
Bradley was killed on or around March 28, 2004, and Wiggins and Caughey were killed within a few hours of one another on or around May 31, 2004. The cases were consolidated for trial. The evidence presented at trial established the following.
Thomas Field testified that in March 2004, he lived at a campsite in the woods in Stuart, Florida. He testified that while Jackie Bradley did not live at his campsite, Bradley stayed at the camp for days or weeks at a time. He stated that he, Bradley, and several others spent the afternoon of Monday, March 28, 2004, in the camp drinking and talking, and that McWatters joined them before dark. Field, Austin Cottle, Sr., and Terry McElroy testified that later that evening, they witnessed a conversation between Bradley and McWatters in which Bradley stated a desire to go somewhere to bathe and McWatters offered that she could go to his cousin's house. Field and McElroy testified that they saw McWatters and Bradley leave together.
Sergeant Sanford Shirk, a deputy sheriff for the Martin County Sheriff's Office, testified that he was called to the scene of a body discovered on the morning of March 31, 2004. The body, later identified as Bradley, was located in a canal connecting two ponds. Bradley was wearing a T-shirt and a bra, which were bunched up into her armpits. Nearby, other clothing was found. Sergeant Shirk explained that after draining the canal, law enforcement officers found 177 pounds of rocks where the body had been. No similar rocks were found elsewhere in the length of the canal, and the rocks were similar to rocks used in a nearby storm water runoff basin located at the end of Garden Street. Sergeant Shirk explained that he had worked on dozens of rape-homicide cases and explained factors that in his experience are common characteristics of rape-homicides.
Sergeant Brian Bergen, of the Martin County Sheriff's Office, testified that Jessica Aleman, McWatters' cousin, whom he considered his sister, lived in a duplex on Garden Street that was within 100 feet of where Bradley's body was found. Sergeant Bergen explained that he spoke with Aleman as part of his effort to canvass the area. McWatters lived with Aleman and was present at the interview. Sergeant Bergen described McWatters as "uninterested and unemotional." Later in the trial, Sergeant Bergen testified that along with Sergeant John Silvas and Sergeant John Cummings, he interviewed McWatters on April 2, 2004. A recording of the interview was played for the jury. During the interview, after initially denying knowing Bradley, McWatters stated that he last saw Bradley two weeks earlier at a business called Able Body. He repeatedly denied offering to take anyone to his cousin's house to shower, denied leaving Field's camp with Bradley, and denied having sex with Bradley.
*621 Charles A. Diggs, M.D., Deputy Associate Medical Examiner for District Nineteen, testified that at the time of discovery, Bradley's body was markedly decomposed and her upper clothing was disheveled. He opined that the state of decomposition was consistent with the body having been outside for three to five days. He testified that toxicology testing revealed that Bradley had a bowel alcohol level of .237 grams per deciliter.[1] Dr. Diggs testified that he did not find any external lacerations, contusions, or hemorrhages. He stated that the injuries contributing to the cause of death were fractures of the thyroid cartilage and hyoid bone and that hemorrhaging in the soft tissue around these structures indicated that Bradley was alive when the bones and cartilage were broken. Based on these injuries, he opined that Bradley was killed by manual strangulation. Dr. Diggs stated that with manual strangulation, loss of consciousness can occur in as little as twenty to thirty seconds but can take longer. He stated that the strangulation mechanism must be applied for about three minutes to cause death. Although Dr. Diggs agreed on cross-examination that he could not rule out a consensual sex act followed by a murder, based on factors that in his experience are common to rape-homicides, he opined that within a reasonable degree of medical probability a rape-homicide occurred in Bradley's case.
The following evidence was presented about the Christal Wiggins and Carrie Ann Caughey homicides. Joseph Hebert and Cyndi Lynn Kaman testified that they, McWatters, and others, including Wiggins, were at Donna Nicholson's house on Driftwood Avenue on the Sunday of Memorial Day weekend 2004. Hebert explained that sometime between 9 p.m. and midnight, he suggested that the group go to his hotel room. McWatters was not invited. Wiggins was invited but stayed behind with McWatters. Hebert testified that as they left, he saw McWatters and Wiggins walking together towards the Li'l Saints store. After about forty-five minutes to an hour, the group returned to Nicholson's house. McWatters and Wiggins were not there.
Erin Elizabeth Cassidy testified that at around 12:30 a.m. on the Monday of Memorial Day weekend 2004, she observed Caughey smoking crack cocaine with a man in his room at the Heritage Inn in Hobe Sound. Cassidy testified that Caughey and the man left the hotel at around 1:30 a.m. and that while the man returned around 3 a.m., Caughey did not return. Jerry Arthur Prevatt testified that between Sunday night and Monday morning of May 30-31, 2004, he stayed at the Heritage Inn and used drugs with Caughey. He explained that at around 2:45 or 3 a.m., he dropped Caughey off in the Li'l Saints parking lot at her request. He stated that he saw McWatters approach Caughey and that the last person he saw her with was McWatters.
Sergeant Shirk was recalled to testify. He testified that on June 3, 2004, he was called to the area of Lincoln Street in Port Salerno, where a body later identified as Caughey had been found about fifteen to twenty feet into a secluded, wooded area. He explained that she was nude from the waist down, her shirt and bathing suit top were pushed up into the armpit area, and she was covered with dead vegetation and vines. He stated that the positioning of clothing was similar to that on Bradley's body. Sergeant Shirk explained that two sandals were found approximately twelve feet apart from one another and that a pair of jeans with what appeared to be *622 grass or dirt stains on them were also found in the woods.
Dr. Diggs was recalled to testify about his autopsy of Caughey. He opined that the state of decomposition was consistent with the victim having been dead for four days. Dr. Diggs testified that Caughey had cocaine and cocaine metabolic products in her system. He explained that two styloid processes were broken and that the hyoid bone was broken at the joint. He did not find any other injuries. Dr. Diggs concluded that Caughey's death was a homicide by manual strangulation. Again, based on the presence of factors that in his experience and training were associated with sexual battery, Dr. Diggs opined that the crime was consistent with a rape-homicide or an attempted rape-homicide.
Detective Joey Obermeyer, a crime scene detective for the Martin County Sheriff's Office, testified that he was called to the Cove Road area on June 7, 2004, because another body had been discovered. That body, which was later identified as Wiggins, was partially skeletonized due to decomposition. He testified that the victim was wearing a shirt and a bra, which were pulled up toward her neck, and a sock. Detective Obermeyer testified that in the vicinity of the body, he found "a number of different spots of dirt in this area that [had been] recently disturbed, which was not consistent with nature." He opined that the spots were indicative of a struggle. A pair of women's panties was found nearby in a tree.
Sergeant Shirk was recalled to testify about the scene where Wiggins' body was discovered. He explained that Wiggins was found to the south along the same lake as Caughey's body. He stated that he saw the same clearing discussed by Detective Obermeyer and agreed that the disturbed dirt was indicative of a struggle. About thirty feet from the clearing, he discovered a pair of women's white sneakers in some palmetto bushes. When asked how the three homicides were similar, Sergeant Shirk responded that "[a]ll three scenes had signs that they were sexually motivated crimes, and all three of these victims appeared to be white [females] with some similar builds."
Dr. Roger Mittleman, M.D., District Medical Examiner for the Nineteenth Circuit, testified that Wiggins was found in a severe state of decomposition, resulting in a partial skeletonization of her remains. Dr. Mittleman found a small amount of cocaine and alcohol in her system and trauma to the neck, including a broken or missing piece of the hyoid bone and a crack in the thyroid cartilage. Dr. Mittleman opined that the cause of death was asphyxia by manual strangulation. According to Dr. Mittleman, a strangulation victim may remain conscious for approximately thirty seconds or several minutes, depending on whether the victim struggled. Although the vaginal examination was inconclusive due to decomposition, Dr. Mittleman opined that Wiggins was the victim of a sexual battery or attempted sexual battery.
Detective Michael Dougherty, of the Martin County Sheriff's Office, testified that on the afternoon of June 7, 2004, about an hour and a half after Wiggins' body had been discovered, he went to McWatters' cousin's house to interview McWatters. Detective Dougherty explained that he and Sergeant Bergen interviewed McWatters without advising him that a third body had been found. Detective Dougherty testified that on that day, McWatters had an abrasion on his eye, his jaw looked bruised, he had scratches under his beard, his right ankle was in a cast, *623 and he was on crutches.[2]
A recording of Detective Dougherty's interview of McWatters was played for the jury. Therein, McWatters explained that on May 30, 2004, he did not talk to Wiggins. He admitted that he was at Nicholson's house that Sunday and met a woman with brown hair. However, he stated that after leaving Nicholson's house, he went to East Stuart to sell crack cocaine. McWatters stated that he knew law enforcement officers would want to talk to him, stating that once "they found another body in Salerno, I was counting the time to when y'all came to fuck with me about this." When Detective Dougherty suggested that the two discovered bodies were not necessarily linked, McWatters responded, "I mean, if they'rethey're threetwo separate cases and they aren't linked together, how come you all supposedly come straight to me?"
Detective Dougherty testified that he again met McWatters on June 18, 2004. Detective Dougherty explained that he asked McWatters to write down his activities on the Friday through Monday of Memorial Day weekend. Dougherty read into the record McWatters' response, wherein McWatters wrote that he visited with his friend Nicholson that weekend and went to the hospital after being hurt during a drug deal. Detective Dougherty testified that he also asked McWatters to complete a questionnaire. McWatters denied knowing who killed the three women or being involved in the killings.
Detective Dougherty testified that he and other law enforcement officers decided to arrest McWatters on an unrelated charge on June 23, 2004. He testified that Sergeant Humphrey arrested McWatters, read McWatters his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and transported him to the Sheriff's Office. Upon arrival, McWatters was first placed in a task force room that was filled with evidence from the homicide investigation and then interviewed by Detective Dougherty and Sergeant Silvas.
A recording of the interview was played for the jury. After initially continuing to deny having any part in Bradley's death, McWatters stated, "I just want to smoke some cigarettes and I'll tell you everything you need to know." When asked about Bradley again, he admitted that he "told her that she could come to [his] sister's house and take a shower" and stated that it was "[p]ossible" that he choked her. He stated that he and Bradley smoked cigarettes and drank together for about twenty to forty minutes as they walked along the bank of the canal and sat at the edge of the woods. He stated that he "tried to have sex with her" and "[s]he wasn't willing at first, but then she finally did." When asked if he killed Bradley, he stated, "I know I'm the one who did it." He stated that after he noticed what he had done, he threw her, her clothing, and her shoes in the water and tried to put rocks on the body.
When asked if Caughey was killed next, McWatters corrected the officer and said that Wiggins was killed next. When asked if he was responsible for Wiggins' death, McWatters answered, "All three." He explained that he met Wiggins at Nicholson's house and that they went into the woods to have sex for crack cocaine. He stated that they walked all the way around the pond and had sex on a path at around 2 a.m. on Monday morning. When the officers asked what happened to upset McWatters, he stated: "We were laughing. I remember *624 that we were having some good consensual sex." McWatters explained, "[A]fter I started to get off, I fucking lost it one more time." He stated that he "probably" threw Wiggins' shoes and that he carried her along a side trail to hide her body. Later, Officer Silvas again asked what happened when McWatters was having sex with Wiggins, and McWatters stated that he did not know, but agreed that sex with Wiggins reminded him of the hatred he had for his ex-girlfriend.
McWatters answered "[y]eah" when asked if he was responsible for Caughey's death. McWatters stated that he encountered Caughey about an hour after he killed Wiggins when she was looking for drugs for Prevatt. McWatters explained that he did not have enough crack cocaine to sell Caughey what she and Prevatt wanted but that he had some that he was willing to share with her. McWatters stated that he and Caughey went to a park, where they smoked crack cocaine and then started having sex. When asked if he killed her where they had sex, he answered, "I believe so." When asked by Detective Dougherty, "Did that rage come out in you again," he answered, "I think so." McWatters explained that he hurt his ankle when he was pulling one of the bodies.
The officers and McWatters had the following exchange about the homicides in general:
Mr. McWatters: The last thing I remember is having sex with them and I was on top of them.
Mr. Silvas: So you were face to face when it happened?
Mr. McWatters: Yeah.
Mr. Silvas: Okay.
Mr. Dougherty: So you wereyou were literally in the process of having sex?
Mr. McWatters: Yes.
Mr. Dougherty: Okay. And then all of a sudden they're not breathing? And they're not bleeding; correct?
Mr. Silvas: So we can only assume what?
Mr. McWatters: I don't know.
Mr. Dougherty: You cut off their circulation somehow. Is that a fair assumption?
Mr. McWatters: Yes.
McWatters stated that he did not get a thrill from the killing and that it made him sick. When pressed for details, McWatters stated that he "[chose] not to think about it." McWatters stated that he was ashamed and that he wanted the victims' parents to be told that he was "deeply sorry."
After this interview, Detective Dougherty took McWatters to the pond where Wiggins and Caughey were found. Detective Dougherty testified that McWatters identified the spot where he had sex with Wiggins, where he threw her panties, and where he dragged her body. Finally, the State introduced recordings of two incriminating calls made from jail by McWatters to family members.
On September 28, 2006, by general verdict, the jury found McWatters guilty on all of the counts of murder and sexual battery. The trial court conducted a penalty phase, during which the State and the defense presented evidence.
The State presented five witnesses. Dr. Mittleman testified that the totality of the circumstances indicated that Bradley, Wiggins, and Caughey were conscious when the strangulations began and that a strangulation victim would be conscious for approximately thirty seconds or more, depending on the degree of struggling and pressure applied to the neck. Sergeant Brian Bergen testified that he took a *625 statement from Aleman, who stated that McWatters knew that he was not allowed to bring anyone to her house under any circumstances. The State concluded by calling one family member of each victim to present victim-impact testimony.
The defense called four witnesses and played an audio recording of a telephone call between McWatters and his aunt, Jackie Wayman. Psychologist Dr. Michael Riordan testified on behalf of the defense. He testified that McWatters functions in the low average intellectual category. Generally, he testified that McWatters was primarily homeless since age thirteen, felt unloved by his family, suffered childhood physical abuse, and had a significant history of alcohol and drug abuse. Dr. Riordan opined that McWatters had a personality disorder and suffered from depression and anxiety. Dr. Riordan did not make findings about whether any statutory mitigating factors applied to the murders because he stopped his examination of McWatters' mental status at the time of the offense when McWatters denied committing the murders.
The defense also called Aileen Flanagan, McWatters' high school teacher at the Challenger School, a school for children with severe emotional, behavioral, and physical handicap problems. Flanagan testified that school records revealed that since kindergarten, McWatters had issues of self-worth, loneliness, depression, and anger. She further testified that McWatters dropped out in the tenth grade and that his family did not support school efforts to help McWatters. Jessica Aleman testified that her mother and father took McWatters into their home after his biological mother lost custody and that McWatters was abused verbally, mentally, and physically by her parents and her mother's boyfriends. Ginny Moore, McWatters' ex-girlfriend, testified that she and McWatters had a son together and that McWatters provided for their son when they lived together and was a good father.
On October 4, 2006, the jury recommended the death sentence for each murder. After conducting a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla. 1993), the trial court sentenced McWatters to death for each murder and life in prison for each sexual battery. On each count, the trial court found four aggravating factors and numerous nonstatutory mitigating factors. The trial court found beyond a reasonable doubt that in each homicide, the aggravating factors substantially outweighed the mitigating factors.

II. GUILT-PHASE CLAIMS
Concerning the guilt phase, McWatters argues that the trial court erred in denying his motion to suppress; in overruling his pretrial objections to similar fact evidence; in permitting certain expert opinion testimony; in denying his motion for judgment of acquittal of first-degree premeditated murder; in denying his motion for judgment of acquittal of sexual battery; in not disqualifying defense counsel and the State Attorney's Office; in admitting irrelevant and prejudicial autopsy photographs; in allowing the State to admit portions of a taped interview containing hearsay; in excluding evidence that another man threatened to strangle victim Bradley; and in admitting evidence that State witness Prevatt was afraid of McWatters. We conclude that McWatters is not entitled to guilt-phase relief.

A. Motion to Suppress
On June 23, 2004, McWatters was arrested by then Sergeant Humphrey on a charge not related to the homicides or sexual batteries. Sergeant Humphrey read a Miranda warning to McWatters at the time of his arrest, after which McWatters *626 asked to speak to Detective Dougherty. The Miranda warning was not re-read before McWatters was interviewed by Detective Dougherty. McWatters moved to suppress his confession on the basis that the delay between the giving of the Miranda warning and the interrogation diluted the effectiveness of McWatters' waiver. The trial court denied the motion, finding that at the time of arrest, Sergeant Humphrey gave McWatters a "thorough and accurate reading of his Miranda rights." The trial court further found that McWatters "understood the rights" read to him and "repeatedly asked to be able to speak to Detective Dougherty." Although McWatters disputes the State's claim that less than one-half hour passed between the warning and the interrogation, he does not challenge the trial court's findings of fact.
Instead, McWatters asks this Court to review the trial court's decision on the issue of whether this was a warn-delay-interrogate strategy that rendered the warning constitutionally inadequate under the United States Supreme Court's holding in Missouri v. Seibert, 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). "[T]he determination of whether the application of the law to the historical facts establishes an adequate basis for the trial court's ruling is subject to de novo review." Connor v. State, 803 So.2d 598, 608 (Fla.2001). We conclude that the trial court did not err in denying McWatters' motion to suppress.
In Seibert, the Supreme Court addressed the propriety of "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." 542 U.S. at 604, 124 S.Ct. 2601. The Supreme Court affirmed the suppression of the statements made after the Miranda warnings. The critical factual circumstance present in Seibert was a custodial interrogation conducted prior to the administration of a Miranda warning. Here, however, there was no pre-warning custodial interrogation. McWatters was given a warning as soon as he was taken into custody, and he has conceded that he was accurately informed of his rights and that he understood his rights before any questioning began. Seibert is simply not applicable in this context, where the defendant was properly advised of his rights pursuant to Miranda and waived his rights prior to any custodial questioning. See Maragh v. State, 905 So.2d 207, 208 (Fla. 3d DCA 2005).
McWatters' more general argument that not readvising him of his Miranda rights immediately before his interview was constitutionally unsound is also without merit. Neither the United States Supreme Court nor any Florida court has set an "expiration date" on properly administered Miranda warnings where the defendant does not invoke his rights. To the contrary, in Escobar v. State, 699 So.2d 988, 994 (Fla. 1997), abrogated on other grounds by Connor, 803 So.2d at 608, this Court rejected an argument that Escobar's statement made six hours after questioning began should have been suppressed because it was not immediately preceded by a Miranda warning. Similarly, in Nixon v. State, 572 So.2d 1336, 1344 (Fla.1990), this Court found a waiver valid where the interrogating detective only partially reminded the defendant of his Miranda rights, because the defendant had previously been given a full reading of his rights approximately eight hours prior to the interview. While the record in this case does not reveal exactly how much time passed between the Miranda warning and the interview, it is clear that the interlude was comparatively brief. McWatters' claim is further undermined by the fact that after being given the warning, *627 McWatters waived his rights by requesting to speak with Detective Dougherty, who did in fact conduct the interview about the homicides. Thus, the trial court did not err in concluding that the law enforcement officers were not obligated to readvise McWatters of his rights immediately before the interview.

B. Collateral Crime Evidence
After the Wiggins and Caughey homicides were consolidated for trial, the State sought to admit evidence of the Bradley homicidewhich had not then been consolidatedas similar fact evidence of a collateral crime pursuant to Williams v. State, 110 So.2d 654, 663 (Fla.1959). The defense objected to the admission of the evidence on the basis that the Bradley case was not sufficiently similar to the Wiggins/Caughey case and that the three crimes did not establish a sufficiently unique pattern of criminal activity to warrant admission under Williams. The trial court ruled that evidence of the Bradley homicide would be admissible in the Wiggins/Caughey trial. At a subsequent hearing, the defense reiterated its objection to the similar fact evidence but made a motion to consolidate all three cases. On appeal, McWatters argues that the trial court erred in ruling that the similar fact evidence was admissible.
The State contends that McWatters waived his Williams rule objection by requesting that the cases be consolidated. This argument is without merit. Here, the defense made clear that it requested consolidation only because of the trial court's ruling on the Williams rule evidence, thereby preserving the issue for appeal pursuant to Joseph v. State, 447 So.2d 243, 245 (Fla. 3d DCA 1983). Joseph held that the defendant's motion to consolidate did not constitute a waiver of his earlier objection to the introduction of collateral crime evidence where the defendant moved to consolidate "only because the trial court had ruled that the collateral crime evidence would be admitted." 447 So.2d at 245. Moreover, McWatters preserved his objection for review by obtaining a pretrial ruling on the admissibility of the evidence. See § 90.104(1), Fla. Stat. (2004) (providing that pretrial ruling on admissibility of evidence preserves objection for appellate review). Accordingly, we turn to the merits of McWatters' Williams rule argument.
In Williams, this Court held that "[i]f found to be relevant for any purpose save that of showing bad character or propensity," "relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime." 110 So.2d at 662, 659. The rule has since been codified in section 90.404(2)(a), Florida Statutes (2006), which provides that "[s]imilar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, ... but it is inadmissible when the evidence is relevant solely to prove bad character or propensity."
This Court has held that before admitting collateral crime evidence, the trial court must make four determinations: whether the defendant committed the collateral crime; whether the collateral crime meets the similarity requirements necessary to be relevant; whether the collateral crime is too remote, so as to diminish its relevance; and whether pursuant to section 90.403, Florida Statutes, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Robertson v. State, 829 So.2d 901, 907-08 (Fla.2002). The Court considers both similarities and dissimilarities between the collateral crimes and the charged offense when reviewing whether "a sufficiently unique pattern of criminal activity [justifies] admission." Peek v. State, 488 So.2d *628 52, 55 (Fla.1986) (quoting Chandler v. State, 442 So.2d 171, 173 (Fla.1983)). A trial court's determination that evidence is relevant and admissible "will not be disturbed absent an abuse of discretion." Taylor v. State, 855 So.2d 1, 21 (Fla.2003) (quoting Sexton v. State, 697 So.2d 833, 837 (Fla.1997)).
In this case, in his confession McWatters admitted to engaging in sex with the victims and then killing the victims. McWatters' defense at trial was that this confession was false and that, even if the confession was true, it only established that the killings "just happened" when he "lost it" during consensual sex. In other words, his defense was that the sex was consensual and the killings were not premeditated. The State argues that the trial court properly admitted collateral crime evidence because it was relevant to the issues of lack of consent, premeditation, and intent.
The trial court did not abuse its discretion in admitting the evidence of the Bradley homicide after concluding that it was substantially similar to the Wiggins and Caughey homicides. The collateral crime evidence was relevant to the issues of lack of consent, premeditation, intent, and absence of mistake. See Conde v. State, 860 So.2d 930, 945 (Fla.2003) ("[T]he collateral crimes evidence established the fact that Conde had committed substantially similar crimes on five prior occasions, which in turn was relevant to numerous material issues, such as identity, intent, and premeditation."); Robertson, 829 So.2d at 909 ("[S]ubstantial similarity of crimes is a requirement when the evidence is sought to be admitted for the specific purpose of establishing absence of mistake or accident.").
In Williams v. State, 621 So.2d 413, 416-17 (Fla.1993), this Court discussed the admissibility of similar fact evidence in a case where the evidence was offered to refute the defendant's claim that his victims consented to sexual activity with the defendant. This Court held that such evidence was relevant to the issue of lack of consent to the extent that it showed "a common plan or scheme." Id. at 417. The defendant in Williams engaged in conversation with his victims about purchasing cocaine or having sex for drugs. He then grabbed each victim from behind and dragged her to a secluded location before attempting to sexually assault her.
As in Williams, we find that the evidence in this case established that McWatters likewise employed a common plan or scheme to gain access to his victims. McWatters knew each of his victims. On the nights of the attacks, he engaged in conversation with the women in public settings but offered them either drugs or a shower to convince them to leave the public settings and accompany him to dark, secluded locations. He refrained from attacking the victims until they reached that secluded location. Accordingly, we find that the collateral crime evidence was relevant to the issue of McWatters' defense that the victims consented to sexual activity with him.
Of course, where collateral crime evidence is offered as probative of identity, this Court also has required a showing of substantial factual similarity among the crimes. See State v. Savino, 567 So.2d 892, 894 (Fla.1990) ("When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or `fingerprint' type of information, for the evidence to be relevant."). In this case, the identity of the perpetrator was not at issue because McWatters confessed to killing all three victims. Nevertheless, the degree of similarity in the pattern of homicides is analogous to the similarities *629 present in cases where the evidence has been offered as probative of identity. Thus, the collateral crime evidence was certainly admissible based on its relevance to the issues of McWatters' intent and whether the homicides were premeditated.
For example, in Crump v. State, 622 So.2d 963 (Fla.1993), this Court found that the following factors cumulatively established a unique pattern or modus operandi, rendering evidence of the second homicide admissible to show identity in the trial of the first homicide:
[B]oth victims were African-American women with a similar physical build and age (Clark was twenty-eight years old, five feet, two inches and weighed 117 pounds; Smith was thirty-four years old, five feet, five inches tall and weighed 120 pounds); Crump admitted to giving a ride to each victim in his truck in the same area, off Columbus Boulevard in Tampa; Crump admitted to the police that he argued with each victim while giving the victims a ride in his truck; both victims' bodies showed evidence of ligature marks on the wrists; both victims died from manual strangulation; both victims' bodies were found nude and uncovered in an area adjacent to cemeteries within the distance of a mile from each other; and the victims were murdered at different sites from where the bodies were discovered.
Id. at 968.
Many similar factors were present in this case. The crimes occurred from around March 28, 2004, through May 31, 2004, within three miles of one another. The victims were all white women and were known to have substance abuse problems. The attacks all occurred at night in dark, secluded areas. The victims were all found nude from the waist down, with their upper clothing pushed up into a similar position, and the cause of death in each case was manual strangulation. Each of the women was found near where she was last seen walking with McWatters, and an effort had been made to conceal each body.
In light of these precedents, we conclude that the trial court did not abuse its discretion in determining the evidence of the Bradley homicide to be admissible in the trial of the Wiggins and Caughey homicides.

C. Expert Opinions on Circumstantial Evidence
McWatters argues that the State solicited improper opinion testimony from Dr. Diggs and Sergeant Shirk. The sole issue raised on appeal is whether the province of the jury was improperly invaded by Dr. Diggs' opinion that within a reasonable degree of medical probability, a rape occurred and Sergeant Shirk's opinion that the crime scene was consistent with a sexually motivated crime. While the State did not formally tender the witnesses as experts, Dr. Diggs and Sergeant Shirk appear to have been called as expert witnesses. A trial court's decision on the admissibility of an expert opinion is subject to an abuse-of-discretion standard of review. See Anderson v. State, 863 So.2d 169, 179 (Fla.2003). McWatters contends that the opinions invaded the province of the jury because the experts' specialized knowledge about the circumstantial evidence was not helpful to the jury. Assuming without deciding that McWatters preserved his arguments for appeal by raising his arguments to the trial court, we conclude that the trial court did not abuse its discretion in allowing the expert opinion testimony.
In Dailey v. State, 594 So.2d 254 (Fla. 1991), a detective admitted as an expert in a homicide and sexual battery case testified during the penalty phase. He testified that "because the victim's body was found nude and her clothing scattered, it *630 was highly likely that a sexual battery or attempt had occurred." Id. at 258. This Court rejected the defendant's argument on appeal that the testimony was within the common understanding of the jury, holding that because the detective "had extensive training and experience in homicides and sexual batteries[,] his expert testimony was helpful in consolidating the various pieces of evidence found at the crime scene." Id.; see also Smith v. State, 28 So.3d 838 (2009) (upholding admission of expert opinion that aspects of the crime scene were consistent with a sexual battery having occurred). Likewise, we find that the expert opinions offered in this case, which were based on the training and experience of the witnesses, were helpful to the jury.
McWatters also argues based on Farley v. State, 324 So.2d 662 (Fla. 4th DCA 1975), that the opinions were improper because the expert witnesses opined that a legal standard was applicable to the facts of the case. We disagree. In Farley, the Fourth District Court of Appeal held that the trial court erred in allowing an expert to testify that based on the presence of sperm in the alleged victim's vagina, she had been raped. The Fourth District distinguished the doctor's opinion in that case from the permissible opinion offered in North v. State, 65 So.2d 77 (Fla.1952). The doctor in North testified, "Because of the multiplicity, nature and distribution of various wounds on this body, [he] concluded that they were most consistent with the person having been assaulted, principally by blunt force, and that the method of assault is most consistent with strangulation." Farley, 324 So.2d at 663 (quoting North, 65 So.2d at 87). The Fourth District explained that the expert's opinion in North that an "assault" caused the victim's injuries was proper because the expert did not opine about whether there was a felonious assault or who made the assault. Id. Like the expert opinion in North, Dr. Diggs used the terms rape and homicide to describe, based on the evidence and his professional training, what he believed likely happened to Bradley. He did not opine conclusively that Bradley was in fact raped or that McWatters was guilty of a crime. Sergeant Shirk's opinion that the crimes were "sexually motivated" likewise offered an explanation of why the women were attacked, without applying a legal standard or identifying a perpetrator.
Finally, McWatters points to a line of cases holding that law enforcement officers may not testify to common patterns of criminal behavior and then opine that the defendant's behavior was consistent with such a pattern. McWatters cites Nowitzke v. State, 572 So.2d 1346 (Fla.1990), where this Court held that it was improper for an expert to testify that drug addicts often steal from their families and commit homicides to support their habit. The Court explained that testimony "concerning past crimes that did not involve the defendant cannot be introduced to demonstrate that the defendant committed the crimes at issue." Id. at 1355. McWatters overlooks that in Anderson v. State, 841 So.2d 390 (Fla.2003), this Court distinguished Nowitzke. In Anderson, an investigator testified that based on his training, it was not typical to find evidence of a hit-and-run accident on both sides of the road ninety feet apart, and thus he did not think that the crime scene was a hit-and-run traffic homicide. The Court held that this opinion testimony was admissible because it was not about past crimes or criminal patterns, but rather about the investigator's experience investigating hit-and-run crimes. Id. at 400-01. The opinions offered in the instant case are more analogous to the expert opinion in Anderson. The opinions were not offered to prove that McWatters was the perpetrator of the *631 crimes or to demonstrate some propensity on his part. Rather, they were offered not to show "who" committed the crimes but to help the jury assess "what" happened at a crime scene by explaining the experts' experience with such crime scenes. Thus, the trial court did not abuse its discretion in allowing the challenged testimony.

D. Premeditation
McWatters argues that the trial court erred in denying his motion for judgment of acquittal of first-degree murder on the theory of premeditated murder. The standard of review regarding such a claim depends on whether the State's case is entirely circumstantial. "On appeal of a denial of a motion for judgment of acquittal where the State submitted direct evidence, the trial court's determination will be affirmed if the record contains competent and substantial evidence in support of the ruling." Walker v. State, 957 So.2d 560, 577 (Fla.2007) (quoting Conde v. State, 860 So.2d 930, 943 (Fla.2003)). However, where a conviction is based wholly upon circumstantial evidence, a special standard of review applies:
[A] conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Darling v. State, 808 So.2d 145, 155 (Fla. 2002) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)).
Even if we assume that the special standard of review applies here, we conclude that there is substantial, competent evidence that McWatters killed Bradley, Wiggins, and Caughey, and that he acted with premeditation. The evidence is inconsistent with McWatters' theory that he was innocent of premeditation. This case is analogous to Gore v. State, 784 So.2d 418, 429 (Fla.2001), in which the Court found competent, substantial evidence supporting Gore's conviction for premeditated murder and rebutting Gore's hypothesis of innocence. The evidence in that case demonstrated that the victim was stabbed in the chest and strangled so forcefully that she suffered a fracture of her trachea. There were no defensive wounds found on the victim's body and no evidence indicated that the murder was the result of a provocation or ill will. The evidence of Gore's history of targeting young, attractive women who drove sporty automobiles and killing or attempting to kill them was critical to the Court's determination that the evidence supported a finding of premeditation. The Court explained that the lack of blood or other physical evidence in the cars demonstrated that Gore did not attack his victims in haste but instead acted with deliberation by removing the victims from their vehicles prior to alerting them that they were in danger.
Similarly, in Crump, the Court found sufficient evidence of premeditation based primarily on the pattern of collateral crimes. The Court explained:
The medical examiner concluded that Clark was strangled because of a fracture of the upper hyoid bone, a fracture of the thyroid cartilage, and small pinpoint hemorrhages in the victim's eyes. Moreover, the Williams rule evidence showed that Crump killed both Clark and Smith in a criminal pattern in which he picked up prostitutes, bound them, strangled them, and discarded their nude bodies near cemeteries. Because the circumstantial evidence standard does not require the jury to believe the defense's version of the facts on which the State has produced conflicting evidence, the jury properly could have concluded *632 that Crump's hypothesis of innocence was untrue.
622 So.2d at 971. Crump is particularly relevant to the instant case because in Crump, the Court found the overall pattern of criminal conduct to be relevant to the finding of premeditation in the first murder. Contrary to McWatters' argument, there is no legal requirement that the jury believe his account of the Bradley homicide simply because that killing occurred first.
This Court also affirmed the denial of a motion for judgment of acquittal of premeditated murder in Conde. In that case, Conde confessed that his victim struggled during the attack, and the medical expert testified about the victim's numerous defensive wounds and opined that it would take approximately three minutes to strangle someone to death. The Court reasoned that this evidence supported a finding that Conde had time to reflect on his actions once the attack began. 860 So.2d at 943.
The instant case is not analogous to Bigham v. State, 995 So.2d 207, 212 (Fla.2008), where we found the record was "devoid of evidence from which it can be inferred that" the defendant intended to kill the victim or desired her death. McWatters approached each of his victims and suggested a reason, either drugs or a shower, for which they might leave their surroundings with him. He then refrained from attacking any of the victims until they were in a secluded location. At some point while engaging in sexual activity, McWatters began to manually strangle each woman. As explained by the medical examiners who testified, the strangulation mechanism must have been applied for about three minutes to cause death. When a law enforcement officer pointed out the similarities between the killings to McWatters during an interview, even McWatters stated that he had no answer for why he did not think "it" would happen again when he went into the woods with Caughey. As in Gore and Crump, we agree that given the evidence that McWatters engaged in a deliberate plan to attack his victims, the jury reasonably could have rejected McWatters' defense.[3] The evidence is inconsistent with any reasonable hypothesis of innocence with regard to premeditated murder.
The record supports the inference that McWatters formed a conscious purpose to kill each of his victims. Given this circumstantial evidence of premeditation, McWatters' admission that he killed the women, and the testimony of witnesses *633 who saw McWatters with the victims shortly before their disappearances, the evidence is sufficient to support the first-degree murder convictions on the theory of premeditated murder.[4]

E. Sexual Battery Convictions
McWatters also argues that the trial court erred in denying his motion for judgment of acquittal as to the sexual battery charges and that the evidence was not sufficient to support his convictions for sexual battery with great force or the first-degree murder convictions under the theory of felony murder based on sexual battery. Section 794.011(3), Florida Statutes (2004), provides in relevant part: "A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony." McWatters admits having sexual intercourse with each woman but argues that no sexual battery occurred because the sexual activity was consensual. Even if we assume that the special standard of review for wholly circumstantial evidence cases applies here, we conclude that the evidence is inconsistent with any reasonable hypothesis of innocence.
In discussing the aggravating factor of murder committed during the course of a felony, the trial court found that the physical evidence and the common scheme displayed across the homicides rebutted the suggestion that any of the victims consented. The trial court additionally found that even assuming each victim initially consented to having sex with McWatters, her consent would have been revoked at the moment he placed his hands around her neck to choke her to death. We agree with the trial court's conclusion that given the facts of this case, particularly the pattern of crimes, there is competent, substantial evidence refuting any reasonable hypothesis of innocence and supporting the jury's verdict.
The events leading up to each of the sexual batteries and homicides in this case are similar to the events reviewed in Zack v. State, 753 So.2d 9, 17-18 (Fla.2000). Zack and his victim, Smith, met at a bar. They smoked marijuana together and later went to Smith's home. Zack claimed that after they had consensual sex, he and Smith argued, and he grabbed a knife in self-defense because he believed that she had gone to retrieve a gun. Zack argued that the trial court should have granted his motion for judgment of acquittal because the evidence was not inconsistent with his hypothesis of innocence. The Court held that the motion was properly denied because the evidence was inconsistent with Zack's claim that he and Smith had consensual sex. The Court explained that although there was evidence implying that "Smith originally intended to engage in consensual intercourse with Zack, such evidence does not negate the expert's opinion, based on the blood evidence and the other physical evidence in the living room, that the assault began as soon as Smith and Zack entered the house." Id. at 18. The physical evidence included shards of glass, blood spray in the living room and on the door frame, and a trail of blood down the hallway. Id. at 14.
*634 In keeping with Zack, we conclude that there is competent, substantial evidence that Wiggins and Caughey were sexually battered. Wiggins may have gone into the woods with McWatters voluntarily, perhaps even intending to have sex with him. Nevertheless, the jury could have concluded from the disturbed dirt and her damaged undergarments that the sex was not in fact consensual. Similarly, while McWatters claimed that he took Caughey's pants and shoes off "[a]ll willingly" and the medical examiner found no lacerations or bruises in the vaginal area, the jury could have reasonably inferred that Caughey's clothes were not removed voluntarily in preparation for consensual sex. The evidence established that at the site where they had sex, Caughey's sandals were found approximately twelve feet apart and her jeans were stained with grass or dirt.
While there was no evidence presented showing that a struggle occurred between McWatters and Bradley, there is evidence in the record refuting McWatters' claim that the sexual activity was consensual and supporting the jury's verdict on that count as well. Before admitting to being an acquaintance of Bradley and having sexual intercourse with her, McWatters repeatedly insisted that he was not with her on the night of her murder. Later, when asked about the circumstances of the killings in general, McWatters stated that the "last thing [he] remember[ed] [was] having sex with [the victims] and [he] was on top of them." He agreed that he was "literally in the process of having sex" when he killed the women. The jury could have reasonably inferred that the defendant should have understood that any consent to sex given by the victims, including Bradley, was terminated when he began to choke them. The fact that each woman was killed during sexual intercoursewhich is based on McWatters' admissionis evidence supporting the finding that at some point, the sexual activity became nonconsensual.
The Bradley sexual battery conviction is also supported by the evidence of a pattern of sexual batteries. While this Court has held that lack of consent may not be found based on evidence of collateral sexual batteries alone, evidence of a pattern of sexual batteries can be relevant to the issue of lack of consent. See Williams, 621 So.2d at 417 (holding that "testimony concerning the other [sexual] encounters was relevant to rebut [the defendant's] defense that the complainant had consensual sex with him in exchange for drugs" and stating that "[t]he similar fact evidence tended to rebut the defense by showing a common plan or scheme"). When the criminal pattern in this case is combined with McWatters' own statements and the expert opinion that the location of Bradley's body, state of her dress, and method of strangulation were consistent with sexual battery, competent, substantial evidence supported the jury's conclusion that McWatters' claim that Bradley consented to sexual intercourse was not worthy of belief. This evidence is inconsistent with any reasonable hypothesis of innocence. Accordingly, we find that McWatters' arguments regarding the sexual battery convictions fail.

F. Disqualification of Defense Counsel and State Attorney's Office
Next, McWatters argues that his Sixth Amendment right to counsel was violated because his defense attorneys, Robert Udell and Russell Akins, operated under a conflict of interest. With regard to Udell, McWatters argues that the trial court failed to conduct an adequate inquiry when Udell disclosed that he previously represented State witness Prevatt. With regard *635 to Akins, McWatters argues that the trial court erroneously denied his motion to discharge Akins on the basis that Akins was once employed by the Public Defender's Office (PDO), which withdrew from the case due to a conflict of interest. McWatters' arguments are without merit.
An actual conflict of interest that adversely affects counsel's performance violates the Sixth Amendment of the United States Constitution. Larzelere v. State, 676 So.2d 394, 403 (Fla. 1996). "Nevertheless, a defendant's fundamental right to conflict-free counsel can be waived." Id. at 403. For a waiver to be valid, the record must show that the defendant (1) was aware of the conflict of interest, (2) realized the conflict could affect the defense, and (3) knew of the right to obtain other counsel. Id.
We conclude that McWatters validly waived any conflict that attorney Udell may have had as a result of his prior representation of Prevatt. The record reflects that McWatters was made aware of the potential conflict of interest. In addition, the record reflects that McWatters realized that the conflict could affect his defense. Udell explained that Prevatt would testify that he saw McWatters with Caughey on the night that she was murdered and that a conflict could arise because Udell would be forced to cross-examine Prevatt. McWatters acknowledged on the record before the trial court that he understood this concern. Finally, the record demonstrates that McWatters knew that he had the right to obtain other counsel. Attorney Udell was appointed to represent McWatters after the PDO and appointed private counsel Bob Watson withdrew due to conflicts of interest. Given this history, McWatters was aware that other counsel would be appointed for him were he to refuse to waive Udell's conflict. McWatters nonetheless expressly waived the conflict.
We also conclude that the trial court did not err in denying McWatters' pro se motion to disqualify defense attorney Akins. The PDO had been appointed to represent McWatters in all three homicide cases on June 24, 2004. On October 11, 2004, the trial court granted a motion to withdraw by the appointed PDO attorney. At the hearing on McWatters' motion to disqualify, Akins testified that he resigned from the PDO on September 30, 2004, but did not become involved in McWatters' case until he was in private practice. He further testified that during his employment with the PDO, he never met with McWatters, never spoke to McWatters' prior attorney, never had any personal interaction with the witnesses named in the prior attorney's motion to withdraw, never participated in their cases, and had no confidential information about those witnesses. Based on this evidence that Akins knew nothing about the State's witnesses and had no confidential information about them, the trial court did not err in holding that Akins did not labor under an actual conflict. See, e.g., Mungin v. State, 932 So.2d 986, 1001 (Fla.2006) (concluding there was no actual conflict where nothing in record supported conclusion that assistant public defender knew that State witness had been represented by his office); Hunter v. State, 817 So.2d 786, 793 (Fla.2002) (holding there was no actual conflict where defense counsel was unaware of his public defender office's previous representation of State witness and did not know witness's criminal background).
McWatters also argues that the trial court erred in denying his motion to disqualify the State Attorney's Office (SAO) for the Nineteenth Judicial Circuit. He contends that the SAO should have *636 been disqualified because the SAO listened to phone calls McWatters made to his lawyers while he was an inmate at the Martin County Jail. This Court has stated that "disqualification is proper only if specific prejudice can be demonstrated. Actual prejudice is `something more than the mere appearance of impropriety.' Disqualification of a state attorney is appropriate `only to prevent the accused from suffering prejudice that he otherwise would not bear.'" Farina v. State, 680 So.2d 392, 395-96 (Fla.1996) (citations omitted) (quoting Meggs v. McClure, 538 So.2d 518, 519-20 (Fla. 1st DCA 1989)). A ruling on a motion to disqualify is reviewed for abuse of discretion. Id. at 395.
At a hearing on McWatters' motion, evidence was presented that the jail systematically recorded all calls made by inmates. A recording was played before each conversation that advised the inmate: "This call is subject to monitoring and recording." After listening to the recorded calls to counsel in camera, the trial court denied the motion. The trial court found that McWatters' statements were limited in a "fashion that strongly indicates his knowledge that he is being monitored or recorded" and that other calls demonstrated that he "clearly knows that he is subject to being recorded." The trial court concluded that "[t]here was no reasonable expectation of privacy in those calls and there was a voluntary waiver of privilege by Mr. McWatters in the face of that lack of reasonable expectation of privacy." The trial court added that there was no evidence "that the substance of these calls provided any benefit to the prosecution" or was used to "any detriment to Mr. McWatters." We agree.
Section 90.502, Florida Statutes (2006), establishes a statutory privilege for communications between a client and his or her lawyer. The attorney-client privilege "attaches only to confidential communications not intended to be disclosed to third persons who are not furthering the rendition of legal services." Mobley v. State, 409 So.2d 1031, 1038 (Fla. 1982). "Whether a communication is confidential depends on whether the person invoking the privilege knew or should have known that the privileged conversation was being overheard." Id. Before every call, McWatters was warned that his calls were subject to monitoring and recording. This Court has held that an inmate has no reasonable expectation of privacy in a telephone communication from jail where the inmate is warned that all calls are monitored or recorded. See Jackson v. State, 18 So.3d 1016 (Fla.2009), cert. denied, ___ U.S. ___, 130 S.Ct. 1144, ___ L.Ed.2d ___ (2010). There was no reason for McWatters to believe that his phone calls to defense counsel would be excluded from this warning. Thus, McWatters waived his right to confidentiality. Based on the foregoing, we find that the trial court did not abuse its discretion in denying McWatters' motion to disqualify the SAO.

G. Admissibility of Evidence
In his remaining guilt-phase claims, McWatters challenges several of the trial court's rulings concerning the admissibility of evidence. We find no harmful error.
First, McWatters argues that the trial court erred in admitting four autopsy photographs because the photographs were irrelevant to any material fact in issue, and even if they were relevant, the relevance was substantially outweighed by unfair prejudice. "The test for the admissibility of photographic evidence is relevance, not necessity." Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). A court's ruling on the relevancy of evidence is reviewed for an abuse of discretion. *637 Belcher v. State, 961 So.2d 239, 253-54 (Fla.2007).
The trial court did not abuse its discretion in allowing the admission, over objection, of the autopsy photographs. This Court has upheld the admission of photographs when they are offered to explain a medical examiner's testimony, the manner of death, the location of the wounds, or to demonstrate the heinous, atrocious, or cruel (HAC) factor. In England v. State, 940 So.2d 389, 399 (Fla.2006), this Court held that the trial court did not abuse its discretion in permitting a medical examiner to testify using autopsy photographs depicting "the victim's head, torso, and hands in a moderately decomposed state with extensive discoloration, skin sloughing off, and insect larvae on the wounds." This Court held that the photographs were relevant to establish the manner and cause of death and the HAC aggravator. Id.
Likewise in the instant case, the autopsy photographs were relevant and corroborative of Dr. Diggs' testimony. The photographs depicted the decomposed heads, necks, and upper torsos of victims Bradley and Caughey. During a proffer, Dr. Diggs stated that he relied on these four photographs to determine the manner and cause of death, and he used the photographs during his testimony to explain to the jury the condition of the bodies and the manner and cause of death. The photographs were also relevant to establishing HAC because Dr. Diggs used these photographs to demonstrate how the victims were strangled. Thus, McWatters' claim that the probative value of the photographs was substantially outweighed by unfair prejudice is without merit.
Second, McWatters argues that his right to confront his accusers was violated when the trial court erroneously permitted the State to play portions of McWatters' June 23, 2004, taped interview. The portions at issue contained statements made by police investigators that Austin Cottle, Sr., Austin Cottle, Jr., and a man named Hilton "Shep" Shepard said that they saw McWatters leave with Jackie Bradley and that they thought he killed her.[5] McWatters argues that since these statements were testimonial and these witnesses did not testify at trial, his right to confront these witnesses as set out in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), was violated. "In considering a trial court's ruling on admissibility of evidence over an objection based on the Confrontation Clause, our standard of review is de novo." Milton v. State, 993 So.2d 1047, 1048 (Fla. 1st DCA 2008) (citing Hernandez v. State, 946 So.2d 1270 (Fla. 2d DCA 2007)).
The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford, the Supreme Court held that testimonial hearsay that is introduced against a defendant violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior meaningful opportunity to cross-examine that witness. Id. at 68, 124 S.Ct. 1354.[6] The Confrontation Clause "does *638 not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 60 n. 9, 124 S.Ct. 1354 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)).
A review of the June 23, 2004, interview reveals that Sergeant Silvas's statements were not offered for the truth of the matter asserted. During the interview, Detective Silvas told McWatters that the Austins stated that they saw McWatters leave with Bradley on the night she was murdered. McWatters responded that he knew about the allegations made by the Austins and that they made those allegations because they were upset with McWatters. With regard to Shep, McWatters, not Sergeant Silvas, raised Shep's name during the interview. McWatters denied ever saying anything to Shep and explained that Shep made these allegations because he was mad at McWatters. Although McWatters' responses to these allegations were not incriminating, McWatters ultimately gave many incriminating responses during this interview. Accordingly, it appears that Sergeant Silvas's statements were admitted solely to give context to McWatters' responses and to set forth the circumstances in which McWatters admitted his culpability after initially denying all involvement in the crimes.
This Court rejected a virtually identical claim in Jackson. 18 So.3d at 1032. We concluded that the trial court did not abuse its discretion in admitting a recorded interview in which a law enforcement officer related statements allegedly made by a codefendant, because the officer's statements were made solely to provoke a reaction from the defendant. They were included in the evidence at trial to give context to the interview, not to prove the truth of the matter asserted.
This case is also similar to Worden v. State, 603 So.2d 581, 583 (Fla. 2d DCA 1992), in which the defendant argued that the trial court erred in permitting an investigator to read to the jury her notes of an interview with the defendant. The Second District Court of Appeal held that the investigator's questions and statements were properly admitted because they were not offered for their truth. Id. Instead, they were offered to place the defendant's answers in context. The Second District explained that "[s]ince the questions were set forth in their proper context, interrogation of a suspected child abuser, we conclude that a rational jury would understand that law enforcement officers use many techniques to secure confessions and that the methods used here were indicative of that." Id.
In this case, the trial court took the additional precaution of giving a limiting instruction to the jury, stating: "Those purported statements by others are not offered for you to consider as true and should not be considered in that fashion. They were used by the officers in order to determine Mr. McWatters' reaction to them." Because the statements were not offered for the truth of the matter asserted, we find that McWatters' reliance on Crawford is unwarranted.
Third, McWatters argues that the trial court erred in excluding proffered testimony. Austin Cottle, Sr.,[7] testified during his proffered examination that Glen Burbaugh allegedly told Bradley that if *639 she went back to her former boyfriend, he would choke her to death. Cottle, Sr., stated that he was not present when Burbaugh made this statement but learned of it through Bradley. Defense counsel conceded that the statement was inadmissible hearsay within hearsay, and the trial court excluded it on that basis. This Court reviews "a trial court's decision to admit evidence under an abuse of discretion standard." Hudson v. State, 992 So.2d 96, 107 (Fla.2008). The trial court did not abuse its discretion. The testimony was hearsay within hearsay. See §§ 90.802, 90.805, Fla. Stat. (2006).
On appeal, McWatters argues that exclusion of this hearsay within hearsay was a violation of due process pursuant to Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The defense never presented this argument to the trial court. Accordingly, the argument was not preserved for appellate review. See § 924.051, Fla. Stat. (2006) (providing that appeal may not be taken from a judgment of a trial court unless "a prejudicial error is alleged and is properly preserved or, if not properly preserved, would constitute fundamental error" and requiring a legal argument "sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor" to preserve an issue); Kokal v. State, 901 So.2d 766, 778-79 (Fla.2005) (holding that specific legal argument or ground must be presented to trial court to preserve issue for appellate review).[8]
Fourth, McWatters argues that the trial court erred in permitting Jerry Prevatt to testify that he had been afraid that McWatters was going to steal from him. Prevatt testified that around 2:15 or 2:30 a.m. on May 31, 2004, he and Caughey saw McWatters at the Li'l Saints store. Prevatt testified that he talked to McWatters about getting drugs but did not give McWatters any money "[b]ecause I was afraid I would get ripped off." McWatters argues that this testimony inappropriately impugned McWatters' character. Any error in admitting the statement was harmless. See Pope v. State, 679 So.2d 710, 714 (Fla.1996) (applying harmless error test to claim that trial court erred in admitting character evidence). McWatters admitted to being responsible for Caughey's death and the other homicides, and in his statements which were played to the jury, McWatters stated on numerous occasions that he took money from various individuals *640 on the promise of buying drugs for them and then kept the money. Thus, the jury would have been aware of McWatters' propensity to keep money that did not belong to him regardless of Prevatt's comment. Given this record, we find no possibility that Prevatt's comment affected the jury's verdict.

III. PENALTY-PHASE CLAIMS
As discussed above, the jury recommended the death sentence for each murder, and the trial court followed the jury's recommendation. In sentencing McWatters, the trial court found four aggravating circumstances to apply to each murder. The aggravating factors were: (1) the defendant was convicted of prior violent and capital felonies (contemporaneous convictions); (2) the capital felony was committed while the defendant was engaged in the commission of a sexual battery; (3) the capital felony was HAC; and (4) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court assigned each factor great weight. The trial court also found numerous nonstatutory mitigating factors.[9]
McWatters argues that the trial court erred in instructing the jury on and in finding that the killings were CCP; in overruling his objection to the CCP jury instruction; and in instructing the jury on and in finding that the killings were HAC. McWatters also argues that Florida's capital sentencing scheme and the aggravating factor of murder committed in the commission of a felony are unconstitutional. Finally, in addition to considering the issues raised by the defendant, in all death penalty cases this Court reviews the record to determine whether the death sentences are proportionate. See Fla. R.App. P. 9.142(a)(6).

A. CCP
McWatters argues that the trial court erred in finding that the CCP aggravating factor applied to each murder and in instructing the jury on CCP. To establish *641 the CCP aggravator, the State must prove beyond a reasonable doubt that (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) the defendant exhibited heightened premeditation (premeditated); and (4) the murder was committed with no pretext of legal or moral justification. § 921.141(5)(i); Pearce v. State, 880 So.2d 561, 575-76 (Fla.2004). This Court's "task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Lynch v. State, 841 So.2d 362, 368 (Fla.2003) (quoting Way v. State, 760 So.2d 903, 918 (Fla. 2000)).
There is competent, substantial evidence supporting the finding that the murders were committed in a cold manner. McWatters met each of his victims in a public setting but suggested a reason, either drugs or a shower, for which they might leave their surroundings with him. He then refrained from attacking any of the victims until they were in a secluded location. McWatters himself stated that he smoked cigarettes and drank beer with Bradley for twenty to forty minutes before attacking her and that he walked all the way around the pond with Wiggins before he attacked her. Similarly, he stated that he and Caughey went to a trailer in an attempt to buy drugs and then walked down Lincoln Street together before they began to smoke crack cocaine and have sex together. This evidence of calm interaction with the victims just prior to the murders supports the trial court's decision to reject McWatters' account of the crime and to find the murders to have been committed in a cold manner. See Wuornos v. State, 644 So.2d 1000, 1008 (Fla. 1994) ("[J]udge and jury were entitled to reject [Wuornos's] testimony as self-serving, unbelievable in light of Wuornos'[s] constantly changing confessions, contrary to the facts that could be inferred from the similar crimes evidence, or contrary to other facts adduced at trial. Thus, the record establishes coldness to the requisite degree."); see also Conde, 860 So.2d at 954 (rejecting self-serving claim that murder was committed in emotional frenzy).
McWatters also argues that there is no competent, substantial evidence supporting the trial court's findings that each murder involved a calculated plan and heightened premeditation. As to the Wiggins and Caughey murders, McWatters' argument is without merit.
This Court has found that a pattern of similar homicides is strong evidence of calculation and heightened premeditation. For example, in Conde, 860 So.2d at 954, this Court found no error in finding CCP primarily based on the defendant's pattern of luring prostitutes to his apartment and strangling them, where the trial court also relied on the fact that after Conde began to strangle the victim, she broke free and struggled with him before he regained control and manually strangled her. In discussing premeditation, the Court explained that Conde admitted that he spent considerable time with the victim, including having sex twice and lying in bed for approximately five minutes before killing her. Id. at 943. Similarly, in Gore, 784 So.2d at 432, this Court held that the trial court did not err in finding CCP based on collateral crime evidence and evidence of lack of resistance or struggle, which indicated that Gore acted calmly and deliberately. See also Wuornos, 644 So.2d at 1008 (finding sufficient evidence of CCP where "Wuornos had armed herself in advance, lured *642 her victim to an isolated location, and proceeded to kill him so she could steal his belongings").
In this case, McWatters, by his own admission, offered drugs to the two women to induce them to go into the woods with him. He admitted that once in a secluded location, he killed the women during sexual intercourse. He further admitted that the killings occurred within a few hours of one another and had no answer for why he did not think "it" would happen again when he went into the woods with Caughey. The remarkably similar manner in which he isolated and attacked Wiggins and Caughey was competent, substantial evidence of calculation and heightened premeditation.
On the other hand, we agree that the State did not prove beyond a reasonable doubt that the Bradley murder was the product of calculation and heightened premeditation. The circumstantial evidence of Bradley's murder is factually similar to that presented in Crump. In that case, the Court found competent, substantial evidence of premeditation where Crump picked up a prostitute, bound and strangled her, and left her nude body near a cemetery. The Court relied on evidence that Crump subsequently murdered another prostitute in a similar manner to find premeditation. However, the Court found the evidence was insufficient to support a finding of "heightened premeditation," stating:
In the sentencing order, the trial judge relied on the Williams rule evidence to show that heightened premeditation exists. We find that the State did not prove beyond a reasonable doubt that Crump had a careful prearranged plan to kill the victim before inviting her into his truck. Thus, the State failed to prove beyond a reasonable doubt the aggravating circumstance of cold, calculated, and premeditated without any pretense of moral or legal justification.
622 So.2d at 972 (footnote omitted). Like McWatters, Crump confessed to killing his victim, but he did not confess to having a preformed plan to kill. He claimed that he strangled the victim after she threatened him with a knife. In this case, there simply is not enough evidence of what transpired between McWatters and Bradley to conclude that that murder was CCP.
"When this Court strikes an aggravating factor on appeal, `the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.'" Williams v. State, 967 So.2d 735, 765 (Fla. 2007), (quoting Jennings v. State, 782 So.2d 853, 863 n. 9 (Fla.2001)). After striking CCP in the Bradley murder, three strong aggravating factors, each given great weight by the trial court, remain: (1) McWatters was convicted of prior violent and capital felonies (contemporaneous murders and sexual batteries); (2) the capital felony was committed while in the attempt, commission, or flight from a sexual battery; and (3) HAC. Moreover, the trial court found that the mitigation "is minimal and does not come close to outweighing the aggravating factors." Overall, when the weighty aggravating factors are compared to no significant mitigation, there is no reasonable possibility that the trial court would have imposed a different sentence had it not considered CCP. Thus, the error in finding CCP and in instructing the jury on that aggravating factor in relation to the Bradley murder was harmless beyond a reasonable doubt.

B. CCP Jury Instruction
McWatters argues that the trial court erred in denying his motion to declare unconstitutional Florida's standard jury instruction on the CCP aggravating factor. *643 Specifically, he asserts that the standard instruction is unconstitutionally vague because it fails to require that the State prove beyond a reasonable doubt intent to kill before the crime began. This Court repeatedly has found Florida Standard Criminal Jury Instruction 7.11(9) to be constitutional. See, e.g., Donaldson v. State, 722 So.2d 177, 187 n. 12 (Fla.1998); Walker v. State, 707 So.2d 300, 316 (Fla. 1997). Furthermore, McWatters' argument that the standard jury instruction fails to require that the State prove intent to kill before the crime began is directly contrary to the instruction given. The trial court instructed that "[t]he premeditated intent to kill must be formed before the killing" and that "[e]ach aggravating circumstance must be established beyond a reasonable doubt before it may be considered." Accordingly, McWatters' claim is without merit.

C. HAC
McWatters argues that the trial court erred in finding that the HAC aggravating factor applied to each murder and in instructing the jury on HAC. "When a defendant asserts that the evidence is insufficient to support an aggravator, this Court reviews the record to determine whether the trial court applied the right rule of law for the aggravator, and, if so, whether competent, substantial evidence supports its finding." Johnson v. State, 969 So.2d 938, 957 (Fla.2007). The "trial court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance." Ford v. State, 802 So.2d 1121, 1133 (Fla.2001).
This Court has held that "it is permissible to infer that strangulation, when perpetrated upon a conscious victim, involves foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable." Ocha v. State, 826 So.2d 956, 963 (Fla.2002) (quoting Tompkins v. State, 502 So.2d 415, 421 (Fla. 1986)). In the instant case, competent, substantial evidence supports the trial court's finding that the victims were conscious when they were strangled.
During the guilt phase, Dr. Diggs testified that a strangulation victim will remain conscious for at least twenty to thirty seconds and that a victim who struggles would lose consciousness after a longer period of time. Similarly, Dr. Mittleman testified that a strangulation victim may remain conscious for approximately thirty seconds or several minutes, depending on whether the victim struggled. During the penalty phase, he opined that the totality of the circumstances indicated that Bradley, Wiggins, and Caughey were conscious when the strangulation began. This Court previously has affirmed a finding of HAC where the medical examiner testified that the victim likely started to lose consciousness within fifteen to twenty seconds from the start of the strangulation. See Johnson, 969 So.2d at 957. Additionally, other evidence supports the conclusion that the victims were conscious when the strangling began. In each case, McWatters stated that he strangled the victims while having sex with them, and in Wiggins' and Caughey's cases, there were signs of a struggle. See Belcher v. State, 851 So.2d 678, 683 (Fla.2003) (noting that evidence of struggle supports finding that victim was consciousness before death). Given this record, the trial court did not err in concluding that these murders were HAC and in instructing the jury on the aggravating factor.

D. Constitutionality of Florida's Capital Sentencing Scheme
McWatters argues that pursuant to Ring v. Arizona, 536 U.S. 584, 122 *644 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Florida's capital sentencing scheme is unconstitutional because it does not require (1) a unanimous jury finding of aggravating circumstances, or (2) a finding beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. McWatters' claims are without merit. This Court has held that the finding of a prior violent felony conviction moots any claim under Ring. See, e.g., Deparvine v. State, 995 So.2d 351 (Fla.2008). In this case, the prior violent felony aggravating factor was found with regard to each murder. We have also specifically rejected the claims of unconstitutionality raised by McWatters. See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007) (rejecting argument that Florida's capital sentencing scheme is unconstitutional because it does not require a unanimous jury recommendation); Williams v. State, 967 So.2d 735, 761 (Fla.2007) (rejecting argument that trial court erred in failing to instruct jury that it was required to determine beyond reasonable doubt that aggravating factors outweighed mitigating factors).

E. Murder Committed while in Commission of Felony
McWatters asserts that the trial court erred in denying his motion for a determination that the aggravating factor of murder during the commission of a felony, § 921.141(5)(d), Fla. Stat. (2003), is unconstitutional on its face and as applied because it constitutes an automatic aggravating factor. This Court has rejected this claim. See, e.g., Banks v. State, 700 So.2d 363, 367 (Fla.1997). This Court also has rejected McWatters' argument that the aggravating circumstance is unconstitutional because a person found guilty of felony murder is more likely to receive a death sentence than a person found guilty of premeditated murder. See Mills v. State, 476 So.2d 172, 178 (Fla.1985); see also Clark v. State, 443 So.2d 973, 978 (Fla. 1983) (rejecting equal protection challenge to aggravating factor of murder committed during commission of a felony).

F. Proportionality
Although McWatters does not challenge the proportionality of his death sentences, this Court conducts a proportionality review in all death penalty cases. This Court compares "the totality of the circumstances in a particular case with other capital cases to determine whether death is warranted in the instant case." Rimmer v. State, 825 So.2d 304, 331 (Fla. 2002). This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Urbin v. State, 714 So.2d 411, 416 (Fla.1998).
In this case, the trial court found four statutory aggravators and gave them all great weight. Although we have struck the CCP aggravating factor in the Bradley murder, the remaining aggravating factors are supported by competent, substantial evidence in each murder. As for mitigating circumstances, the trial court found that most of McWatters' twenty-seven proposed circumstances regarding his background qualified as mitigating. All of the mitigation was based on his background, and none of it pertained to the circumstances of the actual murders. Overall, we agree with the trial court that this mitigation was "minimal" and did not "come close to outweighing the aggravating factors."
In light of this aggravation and mitigation, and in comparison with factually analogous cases in which this Court ruled that death was a proportionate penalty, each death sentence is proportionate. For example, in Johnston v. State, 863 So.2d 271, 286 (Fla.2003), this Court held *645 the death sentence proportionate in a strangulation murder where the trial court found and weighed HAC and prior violent felony against the statutory mitigating factor of substantially impaired capacity and twenty-six nonstatutory mitigating factors. The instant case involves considerably less mitigation, as the trial court did not find either statutory mental health mitigating factor. This case also involves more aggravation because the murders were committed during the course of sexual batteries. Accordingly, McWatters' death sentences are proportionate. See also Smithers v. State, 826 So.2d 916, 931 (Fla.2002) (holding death sentence proportionate where victim was strangled, stabbed, and beaten, and trial court weighed prior violent felony, HAC, and CCP against two statutory mental health mitigating factors and seven nonstatutory mitigating factors); Johnston v. State, 841 So.2d 349, 360 (Fla.2002) (holding death sentence proportionate for sexual battery, beating, and strangulation of victim where aggravating factors included prior violent felony conviction, commission of murder during sexual battery and kidnapping, pecuniary gain, and HAC and mitigating factors included substantially impaired capacity to appreciate criminality of conduct and twenty-six nonstatutory mitigating factors); Orme v. State, 677 So.2d 258, 263 (Fla.1996) (holding death sentence proportionate for the sexual battery, beating, and strangulation of victim where aggravators included HAC, pecuniary gain, and commission during sexual battery and mitigating factors included substantially impaired capacity and extreme emotional disturbance).

IV. CONCLUSION
Based on the foregoing, we affirm McWatters' convictions for first-degree murder and sexual battery with great force and his sentences of death.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
QUINCE, C.J., concurs with an opinion.
LABARGA and PERRY, JJ., did not participate.
QUINCE, C.J., concurring.
I agree with the resolution of this case, but wish to express my concern with the tactics the Martin County Sheriff's Office employed during its interrogation of McWatters.
McWatters was met at a restaurant and given a Miranda warning based on a charge unrelated to the murders and sexual batteries. McWatters asked to speak to Detective Dougherty at this time. He was purposely not interrogated, but, instead, was transported to the Sheriff's Office and placed in a room containing evidence from the murders. After some time, the officers told him that he had been mistakenly placed in the room, and escorted him through the Sheriff's Office, past witnesses related to the murder investigations. Finally, McWatters was taken to an interrogation room, where he confessed.
When McWatters was given his Miranda warning, he was adequately and effectively apprised of his rights, which he waived by asking to speak with Detective Dougherty. A relatively short delay did not render the warning or the waiver ineffective. However, the United States Supreme Court has acknowledged that there are cases in which a defendant can argue "a self-incriminating statement was `compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda." Missouri v. Seibert, 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion) *646 (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). While I do not believe this to be one of those cases, the tactics law enforcement used in this case border dangerously close to what is impermissible.
The Supreme Court explained that the purpose of a Miranda warning is to give a criminal defendant adequate and effective knowledge of his or her constitutional right against self-incrimination. See Seibert, 542 U.S. at 611, 124 S.Ct. 2601 (addressing the constitutionality of a strategy in which law enforcement would get suspects to confess, read them their rights, and then walk them through their confession for the purpose of using it against them at trial). In Seibert, the Supreme Court held that the tactic designed "to get a confession the suspect would not make if he understood his rights" was unconstitutional. Id. at 613, 124 S.Ct. 2601. Such strategies not only undermine Miranda warnings, but thwart the purpose of reducing the risk of coerced confessions. Id. at 616-17, 124 S.Ct. 2601.
At trial, Detective Dougherty admitted that the psychological ruse used in this case was designed to keep McWatters from invoking his rights. I reserve judgment as to whether this strategy would have been constitutional if McWatters had not voluntarily waived his rights prior to the tactic being fully implemented. However, a strategy intended to discourage defendants from invoking their rights comes to the very edge of what is constitutionally permissible, and runs the very real risk of circumventing the constitutional protections afforded by Miranda warnings. In light of this, I would discourage the use of interrogation tactics like those employed here.
NOTES
[1] No blood was available for toxicology testing.
[2] Sergeant Bergen also testified that on June 7, 2004, McWatters was on crutches, his right foot was bandaged, and there were scratches on his face.
[3] In addition, there was evidence that McWatters engaged in a struggle with victims Wiggins and Caughey. Detective Obermeyer testified that there were spots of disturbed dirt indicative of a struggle near Wiggins' body. Earl Ritzline testified that the panties found near Wiggins were torn and that the hooks on her bra were "bent significantly," which could be interpreted as evidence of use of force. Caughey's sandals were found approximately twelve feet apart from one another and her jeans were stained with grass or dirt, from which the jury could have inferred that her clothing was not removed voluntarily in preparation for consensual sex. Finally, McWatters was using crutches and had scratches on his face shortly after the homicides, from which the jury could have inferred that the victims attempted to defend themselves. This Court has held that there was sufficient evidence of premeditation in strangulation murders where there was evidence that the victim struggled. See, e.g., Johnston v. State, 863 So.2d 271, 285-86 (Fla. 2003) (concluding evidence of premeditation was sufficient where medical examiner opined that strangulation was not constant and defensive injuries showed victim struggled); Holton v. State, 573 So.2d 284, 289 (Fla. 1990) (upholding sufficiency of evidence of premeditation where victim was found with ligature around her neck and defendant had fresh scratch marks on his chest).
[4] The State argued both felony murder and premeditated murder, and the jury delivered a general verdict. "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So.2d 59, 73 (Fla. 2004).
[5] During the taped interview, Sergeant Silvas referred to statements made by "both Austins, Senior and Junior." McWatters' brief challenges the admission of statements to the extent that they were attributed to Austin Cottle, Sr. Because Cottle, Sr., testified at trial, thereby providing McWatters an opportunity to cross-examine him, it seems likely that the defense meant to challenge the admission of the statements to the extent that they were attributed to Cottle, Jr.
[6] "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraint at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 60 n. 9, 124 S.Ct. 1354.
[7] McWatters' brief refers to Austin Cottle, Jr., who did not testify at trial. Rather, the defense attempted to admit this statement through Austin Cottle, Sr.
[8] McWatters' claim is also without merit. In Chambers, the defendant argued that he was denied due process when on the basis of a Mississippi common-law rule that a party may not impeach his own witness, the trial court refused to allow Chambers to cross-examine witness McDonald about McDonald's prior confession to the murder. Chambers was also prohibited from calling several witnesses who would have testified that McDonald confessed. Id. at 294, 93 S.Ct. 1038. The United States Supreme Court found that the excluded hearsay statements "bore persuasive assurances of trustworthiness and thus [were] well within the basic rationale of the exception for declarations against interest." Id. at 302, 93 S.Ct. 1038. As a result, the Supreme Court narrowly held that "under the facts and circumstances of this case," the State's refusal to permit Chambers to cross-examine McDonald coupled with the exclusion of hearsay fitting one of the traditional hearsay exceptions deprived Chambers of a fair trial. Id. at 303, 93 S.Ct. 1038. In this case, McWatters does not assert that the trial court prevented him from calling or cross-examining Burbaugh as a witness. Moreover, he has not shown that the double hearsay statement fit the "basic rationale" of a traditional hearsay exception. Because the cases are not factually or procedurally similar and Chambers was expressly limited to its facts, McWatters has failed to establish a due process violation. Moreover, even if the trial court erred in excluding the statement, McWatters fails to meet the stringent requirements of fundamental error.
[9] The trial court found that the following nonstatutory mitigating circumstances were established: (1) McWatters was separated from his mother at a young age; (2) he was deprived of a family feeling and felt that he was burdened and used by his aunt who raised him; (3) he was physically abused since childhood; (4) he was punished for displaying academic difficulties; (5) his home environment was unstable; (6) he lacked support from parental figures; (7) he lacked guidance from parental role models; (8) he was a product of a dysfunctional family and displayed positive characteristics; (9) he was raised in poor conditions and was not properly clothed; (10) he experienced neglect as a child due to impoverished conditions and alcoholism on the part of his caretakers; (11) he was exposed to irresponsible behavior by his role models; (12) he has been a loved member of his family; (13) he experienced a great deal of conflict, chaos, and violence during his developmental years; (14) he was emotionally disturbed, as evidenced by his placement at the Challenger School; (15) his emotional disturbance significantly and negatively affected his academic functioning and his ability to develop and maintain peer relationships; (16) he was unable to adjust to and accept his emotionally disturbed condition; (17) his clinical condition interfered with academic achievement; (18) his emotional condition was complex and negatively affected his academic and social functioning; (19) he began a pattern of alcohol abuse in early childhood; (20) his unchecked childhood alcohol abuse was modeled on his parental figures; (21) his use of alcohol was reinforced by a sense of peer acceptance; (22) his early childhood substance abuse and emotional condition led to a long-standing drug abuse problem; (23) his drug abuse developed into a dependence for which he was never treated; (24) he suffered from mental illness as a young child; and (25) he has not received mental health treatment since childhood, and his ability to cope with the vicissitudes of life has been compromised.